**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| GOTV NETWORKS LLC,<br><br>Plaintiff,<br><br>v.<br><br>TARGET CORPORATION,<br><br>Defendant. | **Case No. 2:26-cv-00608**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff GoTV Networks LLC ("GoTV Networks") files this Complaint against Defendant Target Corporation ("Target") for infringement of United States Patent Nos. 8,009,619; 8,060,594; 9,766,080; and 11,317,238, and alleges as follows:

**NATURE OF THE ACTION**

1. This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*.

2. GoTV Networks seeks monetary damages and equitable relief as set forth in the Prayer for Relief.

**THE PARTIES**

3. GoTV Networks is a limited liability company organized under the laws of the State of Delaware, with a place of business at 300 Delaware Avenue, Suite 210, Wilmington, Delaware 19801.

4. Defendant Target Corporation is a corporation organized under the laws of the State of Minnesota and has a principal place of business at 1000 Nicollet Mall, Minneapolis, Minnesota 55403-2542.

5. Target Corporation may be served through its registered agent for service, CT Corporation System, located at 1999 Bryan St., Suite 900, Dallas, TX 75201.

6. Target conducts business nationally, including within this district.

7. On information and belief, Target makes, uses, sells, offers for sale, imports, or otherwise provides, directly or indirectly, products and services that infringe the Patents-in-Suit, including in the State of Texas and the Eastern District of Texas.

8. On information and belief, Target's customers use and access Target's infringing products and services, including in the State of Texas and the Eastern District of Texas.

9. On information and belief, Target induces its customers' use and access of Target's infringing products and services, including in the State of Texas and the Eastern District of Texas.

10. Over the past decade, Target has undergone a significant digital transformation to remain competitive in an increasingly mobile-first retail environment. Its customer base includes a broad mix of shoppers, ranging from everyday household consumers to families and style-focused buyers. These customers expect convenient access to product information, pricing, availability, and customer support from virtually any location, including while shopping inside Target stores. This shift reflects the reality that modern consumers rely on handheld devices, such as smartphones, not only for at-home browsing but also to make real-time purchasing decisions while navigating store aisles, pickup areas, and parking lots.

11. To meet these expectations, Target Corporation has developed a comprehensive digital ecosystem that integrates its inventory management systems, customer service tools, and e-commerce infrastructure into a cohesive, near real-time user experience. This ecosystem is accessible across multiple digital touchpoints, including its mobile application and website. The infringing Target Mobile Application, for example, allows users to check product availability at nearby stores, view aisle locations for in-store items, and manage orders for pickup, delivery, or shipping. It also incorporates features tied to the Target Circle loyalty program, enabling users to track rewards, access personalized offers, and apply savings during checkout. Many of these features are updated dynamically to reflect current store inventory and order status. Additionally, the infringing Live Chat System is embedded in both the Target Mobile Application and the Mobile Website (target.com). It connects customers immediately with support agents for product questions, order assistance, or troubleshooting. Typing indicators and message delivery confirmation appear in real time within the Live Chat System.

12. At the heart of this ecosystem lies a network of backend servers. These servers serve as the central control system for all real-time communications between customer devices and Target's core business platforms. These servers receive incoming connection requests from client software components running within the Target Mobile Application, the Live Chat System, and the Mobile Website. They then dynamically manage the communication protocols to ensure uninterrupted service.

## JURISDICTION AND VENUE

13. GoTV Networks repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

14. This is an action for infringement of United States patents arising under 35 U.S.C. §§ 271, 281, and 283-285, among others. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

15. Target operates over two thousand stores within the United States and its territories, including stores in the State of Texas, which further includes stores within this Judicial District.




*See e.g.*, https://www.target.com/store-locator/find-stores/Marshall,TX.

16. Target provides mobile device applications through at least Google Play and Apple App Store that infringe the Patents-in-Suit.

17. Target's mobile applications and related systems are accused instrumentalities available through at least Google Play (https://play.google.com/store/apps/details?id=com.target.ui&referrer=utm_source%3DTarget%26utm_campaign%3Dtgtlp) and Apple App Store (https://apps.apple.com/us/app/target-shop-style-save/id297430070) (herein collectively with any other shopping application available by

Target, the "Target Mobile Application"), which are developed and maintained by Target for use by customers, including customers in locations within the State of Texas and the Eastern District of Texas.

18. Target, on its own and/or via its divisions, subsidiaries, partners, and affiliates maintains a corporate and commercial presence in the United States, including in the State of Texas and in this judicial district, via at least (1) physical locations established throughout Texas, including in this judicial district; (2) Target's online presence (*e.g.*, https://www.target.com/); and (3) the Target Mobile Application that provides mobile device users access to Target's communication, shopping and navigation products and services, including those features identified as infringing herein. Thus, Target does business, including committing direct and indirect infringing acts, in the United States, in the State of Texas, and in this Judicial District.

19. Target has made, used, offered to sell and/or sold products and services, including the following specifically accused products and services: (1) the Target Mobile Application;[1] (2) products and services associated with the Target Mobile Application; (3) products and services associated with Target's website;[2] (4) current or legacy products or services, which use, or have used, one or more of the foregoing products and services as a component product or component service; (5) combinations of products and/or services comprising, in whole or in part, two or more of the foregoing products and services; and, (6) all other current or legacy products and services imported, made, used, sold, or offered for sale by Target that operate, or have operated in a substantially similar manner as the above-listed products and services. (As used herein, one or more of the foregoing products and services are individually and collectively referred to as the

[1] *See e.g.*, https://www.target.com/c/target-app.

[2] *See e.g.*, https://www.target.com/; https://www.target.com/help/contact-us.

accused "Target Products and Services"). On information and belief, the Target Products and Services or their use infringe(s) at least one claim of each of the Patents-in-Suit.

20. Target, as well as the hardware and software components comprising Target Products and Services and/or that enable Target Products and Services to operate, including but not limited to servers, server hardware, server software, website software, webservers, client-side software, mobile software, mobile app software, and browser executable software, software development kits (SDKs), and/or any of the foregoing which are supplied by Target's technology vendors that act on its behalf, (each individually and collectively referred to herein as the accused "Target System"), infringe (literally and/or under the doctrine of equivalents) at least one claim of each of the Patents-in-Suit.

21. This Court has personal jurisdiction over Target, at least, because it committed acts of infringement in this judicial district in violation of 35 U.S.C. §§ 271(a) and (b). In particular Target has made, used, offered to sell access to, and/or sold access to the accused Target Products and Services in the Eastern District of Texas; has made, used, offered to sell access to, and/or sold access to Target System in the Eastern District of Texas; and has induced the use by its customers of Target Products and Services and Target System in the Eastern District of Texas.

22. Target is subject to the Court's jurisdiction because it regularly conducts and solicits business, or otherwise engages in other persistent courses of conduct in this judicial district, and/or derives substantial revenue from the use, sale, and distribution of goods and services, including but not limited to with respect to the accused Target Products and Services provided to individuals and businesses in the Eastern District of Texas.

23. Target directly infringed the Patents-in-Suit in Texas including specifically the Eastern District of Texas through use, offers to sell access to, and/or sales of access to the accused Target Products and Services in the Eastern District of Texas, and its making, use, offers to sell access to, and/or sales of access to Target System in the Eastern District of Texas.

24. On information and belief, one or more of the accused Target Products and Services and/or Target System were made, used, sold and offered for sale by Target, its subsidiaries and/or agents, in the Eastern District of Texas.

25. On information and belief, Target's customers located in the Eastern District of Texas have obtained access to and used the accused Target Products and Services and/or Target System while located in the Eastern District of Texas.

26. The Court has personal jurisdiction over Target, at least, because it has continuous business contacts in the State of Texas and in the Eastern District of Texas and Target has engaged in business activities including transacting business in the Eastern District of Texas and purposefully directing its business activities, including the sale or offer for sale of Target Products and Services to the Eastern District of Texas to induce, aid, abet, and/or contribute to the infringement of third parties in the Eastern District of Texas, including without limitation the direct infringement of Target's customers located in the Eastern District of Texas through the use of Target Products and Services and Target System, while they are located within the Eastern District of Texas.

27. This Court has personal jurisdiction over Target because, *inter alia*, Target, on information and belief: (1) has committed acts of direct and indirect patent infringement in this Eastern District of Texas; (2) has substantial, continuous, and systematic contacts with this State and the Eastern District of Texas; (3) enjoys substantial income from its operations and sales in

this State and the Eastern District of Texas; (4) employs Texas residents in this State and the Eastern District of Texas, and (5) solicits business using Target Products and Services and Target System in this State and the Eastern District of Texas.

28. On information and belief, Target supported and marketed Target Products and Services and Target System in the State of Texas and this Judicial District, to customers and potential customers, who reside in the State of Texas and in this judicial district through various means, including through the efforts of its agents and/or employees who reside in the Eastern District of Texas.

29. Venue is proper pursuant to 28 U.S.C. § 1400(b), at least because Target committed acts of infringement in this judicial district, maintains regular and established places of business in this judicial district, and maintains employees within this judicial district. https://www.target.com/store-locator/store-directory/texas.

30. By way of example, Target Corporation operates a regular and established place of business within the Marshall Division of this Judicial District at, among other locations, 3092 N Eastman Road, Longview, Texas 75605 (Gregg County), where Target Corporation employs Texas residents, holds itself out as operating a Target retail store, and conducts the accused acts of infringement, including by providing customers access to the accused Target Mobile Application, Store Mode, location-based shopping features, pickup features, and customer-support features in connection with that store.

## THE PATENTS-IN-SUIT

## United States Patent No. 8,009,619

31. On August 30, 2011, the USPTO duly and legally issued United States Patent No. 8,009,619 ("the '619 patent") entitled "Server-side wireless communications link support for mobile handheld devices" to inventors Philippe Clavel, and Bryan Waters.

32. The ’619 patent claims priority to U.S. Patent Application No. 11/977,319, filed on October 23, 2007. Accordingly, the ’619 patent is entitled to a priority date of at least as early as October 23, 2007.

33. The ’619 patent is presumed valid under 35 U.S.C. § 282.

34. GoTV Networks owns all rights, title, and interest in the ’619 patent.

35. GoTV Networks has not granted Defendant an approval, an authorization, or a license to the rights under the ’619 patent.

36. The ’619 patent relates to, among other things, methods and systems for implementing wireless communications links for wireless mobile handheld devices.

37. Mobile handheld devices vary widely in their hardware capabilities and supported network protocols. The ’619 Patent explains that, depending on a device’s sophistication, a developer “must either custom write communications routines… for more primitive devices, or merely hook into established APIs… for more advanced devices, or some combination of the two for devices that are in between.” ’619 Patent at 1:63-2:18. This approach demands significant coding and debugging effort for each device type, and developers “simply do not have the time or the resources to take even a single application through a customized QA and debugging process for all the different types of handheld devices that comprise the market.” *Id.* In short, prior to the inventions of the ’619 Patent, application developers faced a technical challenge in providing reliable wireless connectivity across numerous device types, network technologies (*e.g.*, CDMA vs. GSM), and varying signal conditions without an excessive, device-specific development burden.

38. The ’619 Patent identifies a need for a unified technical solution to this problem. It notes that “what is required is a standardized method for implementing wireless

communications links for wireless mobile handheld devices" that can "adapt to the various different technologies used to implement a communications link between a handset and a server to provide a standardized way to communicate regardless of the carrier and regardless of the handset type." *Id*. at 2:18-29. It further calls for "a solution that is transparent to an application developer and presents a standardized, device-independent interface." *Id*. at 2:25-27. The patent then states that "the present invention provides a novel solution to these requirements," indicating that the invention fulfills this need with a new technical approach. *See Id.* at 2:18-29. These statements from the specification frame the invention as solving a specific technical problem in the field of wireless communications, namely, how to maintain an optimal communication link for any given device and network automatically, without requiring bespoke coding for each scenario.

39. By way of example, Claim 9 of the '619 Patent recites a specific server-side apparatus that implements the above-discussed technical solution. Claim 9 recites a server with a processor and memory storing processor-readable code configured to establish and manage a wireless communication link with a handheld device through specific cooperating components. For example, the claimed apparatus is configured to perform "receiving, at a server and via a communications network, a request for a communications link from a client communications component executing on a handheld device" and "establishing the communications link with the handheld device using a server communications interface executing on the server." *See e.g.*, '619 Patent at claims 1 and 9. In other words, the server's communications interface software listens for a connection request from the device's client-side communications component and then initiates a wireless link to that device. This is a specifically claimed technical interaction between

a client communications component on the handheld device and a server communications interface on the server, over a network, to set up a live communication channel.

40. Once the link is established, Claim 9 requires that the apparatus automatically select an optimized communication protocol from an enumerated set of protocols based on whether a measured quality of the wireless communications link is at or above a threshold or below it, while keeping the standardized API exposed to the server application consistent. *See also,* id. at claim 9. Specifically, at the initial connection, the server and device implement an "optimized protocol" selected from a defined set of communication protocols based on whether the "quality of the wireless communications link is above or equal to a threshold" or below it. *See id.* at claim 9. The optimized protocol is implemented "while maintaining a standardized application programming interface (API) for the server communications interface," and the link is established via the client's communications component "functioning with a device API component to configure hardware of the handheld device." *See e.g., Id*. at claims 1, 9. In effect, the claims require the system to detect the context and automatically use an appropriate communications protocol (such as a socket or HTTP-based protocol) optimized for that context. Importantly, this is done without changing the server's external API.

41. Claim 9 also addresses varying real-time network conditions by tying protocol selection to a measured quality of the wireless communications link. Specifically, Claim 9 requires that the server "automatically select, as an optimized protocol, a socket full-duplex connection protocol if a quality of the wireless communications link is above or equal to a threshold, or one of a socket half duplex connection protocol, an HTTP tunneling protocol, and an HTTP polling protocol if the quality of the wireless communications link is below the threshold." *Id.* at claim 9. In other words, the system continuously monitors the quality of the

wireless communications link and selects an appropriate protocol from the enumerated set based on whether that link quality is above or below the recited threshold — ensuring that, as network conditions change, the server delivers an optimized communications protocol better suited for the prevailing conditions.

42. Moreover, the claims confine the protocol choices to a specific set of well-defined communication techniques, including "a socket full-duplex connection protocol, a socket half duplex connection protocol, an HTTP tunneling protocol, and an HTTP polling protocol" and selects the optimized protocol from this enumerated set based on the threshold described above. *Id.* By enumerating these protocol options, the claim ensures that the "automatic implementing" involves selecting among concrete networking methods (*e.g.*, switching from a full-duplex socket to an HTTP polling approach if the link degrades). This dynamic protocol switching is performed under the control of the server communications interface and the client component, without manual intervention, to maintain an optimal link as conditions change. Throughout this process, the standardized API to the server application is maintained, so the application itself remains unaffected by the change in protocol. *Id*.

43. The claimed invention thus provides a specific technological improvement in the field of wireless communications. It creates a server-client framework that automatically optimizes how data is exchanged with mobile devices, based on, for example, device type and live link quality, all while exposing a uniform interface to application developers. The patent's disclosure underscores that maintaining speedy, reliable connections is critical for user experience (*Id*. at 1:38-44), and the claims achieve this by transparently managing protocol selection and switching at a low level. The claimed advance lies in this automatic, context-aware protocol management combined with a hardware-integrated design: the server's communications

interface and the device's API/hardware layer work together to select the best available protocol and seamlessly reconfigure the connection when network conditions change. Unlike a generic computer performing routine tasks, the claimed system is configured with specialized components operating in an unconventional manner to solve a concrete problem in network connectivity. *See e.g.,* id. at claims 1 and 9.

44. In sum, all of the claims of the '619 Patent are directed to a particular technical solution – a novel server-side communications architecture that intelligently selects and switches communication protocols – and it recites significantly more than a mere idea of communication, embodying a practical improvement in computer networking functionality.

45. The specific combination of (a) a server-side communications interface that listens for connection requests from a client communications component executing on a handheld device, (b) automatic selection of an optimized protocol from a defined set of communication protocols (a socket full-duplex connection protocol, a socket half duplex connection protocol, an HTTP tunneling protocol, and an HTTP polling protocol) keyed to whether a quality of the wireless communications link is above or below a threshold, (c) automatic implementation of the selected protocol while maintaining a standardized application programming interface (API) for the server communications interface, and (d) configuration of the handheld device's hardware via a device API component functioning with the client communications component, was not a conventional arrangement of generic computer components at the time of the invention. Each of these features, and particularly their ordered combination, represents specific, non-conventional technological choices described in detail in the '619 patent specification.

46. Whether the claimed elements of the ’619 patent — individually or in combination — were well-understood, routine, and conventional at the time of the invention is a question of fact. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). The factual allegations set forth herein, supported by the specification of the ’619 patent, must be accepted as true at the pleading stage and preclude any finding of patent ineligibility under 35 U.S.C. § 101.

**United States Patent No. 8,060,594**

47. On November 15, 2011, the USPTO duly and legally issued United States Patent No. 8,060,594 (“the ’594 patent”) entitled “Client-side wireless communications link support for mobile handheld devices” to inventors Philippe Clavel, and Bryan Waters.

48. The ’594 patent claims priority to U.S. Patent Application No. 11/977,319, filed on October 23, 2007. Accordingly, the ’594 patent is entitled to a priority date of at least as early as October 23, 2007.

49. The ’594 patent is presumed valid under 35 U.S.C. § 282.

50. GoTV Networks owns all rights, title, and interest in the ’594 patent.

51. GoTV Networks has not granted Defendant an approval, an authorization, or a license to the rights under the ’594 patent.

52. The ’594 patent relates to, among other things, methods and systems for implementing wireless communications links for wireless mobile handheld devices.

53. The claims of the ’594 Patent address a specific technical problem in mobile wireless communications, namely, the difficulty of implementing reliable network links across many different handheld devices. The patent explains that mobile devices vary widely in hardware and capabilities, forcing developers to write custom communication code for each device or platform. For example, “[d]epending upon the degree of capability of a given device,

the developer must either custom write communications routines or network layer code (*e.g.*, interrupt service routines, Internet protocol stacks, etc.) for more primitive devices, or merely hook into established APIs for more advanced devices, or some combination of the two for devices that are in between. This causes a large amount of developer coding time" simply to get an application working on a given device model. ('594 patent, 1:63-2:18.) Developers "do not have the time or the resources" to repeat this process for every handset. (Id.) Moreover, wireless network carriers use different technologies and connections fluctuate as users move, so an "application developer is confronted with a large number of different technology architectures, network topologies, [and] software interfaces" that must be accommodated to achieve a fast and reliable connection. ('594 patent, 1:45-62.) In short, prior to the '594 Patent there was no uniform, efficient way to maintain a high-quality wireless link across diverse devices and varying network conditions.

54. The '594 Patent identifies and directly addresses these technical challenges. It states that "what is required is a standardized method for implementing wireless communications links for wireless mobile handheld devices" that can "adapt to the various different technologies used to implement a communications link between a handset and a server" and provide a "standardized way to communicate regardless of the carrier and regardless of the handset type." ('594 patent, 2:19-29.) It further emphasizes the need for "a solution that is transparent to an application developer and presents a standardized, device-independent interface." ('594 patent, 2:19-29.) The patent then introduces a specific technical solution to meet these requirements. In particular, the patent discloses and claims a system that dynamically manages the wireless link and shields application developers from the underlying complexities of different networks and device hardware.

55. For example, Claim 1 recites a concrete, technical method that includes, for example, "accessing a device API component to configure device hardware to implement the communications link" ('594 Patent, claim 1.). The claimed invention utilizes the device's built-in API layer to set up the wireless hardware for communication. Through this design, the invention leverages standard device interfaces instead of bespoke code for each model. The '594 Patent explains that the client communications component can include "a hardware abstraction component for translating between the communications component and device specific hardware functions of the handheld device." ('594 Patent, 3:1-12.) This hardware abstraction layer "enables the communications component to implement a stable communications API, and maintain the same stable communications API even when installed on multiple different handheld device types having different device specific hardware functions." (Id.) In other words, the claimed hardware abstraction component presents a uniform API to the software above, regardless of the particular handset's hardware. This was not a conventional feature in prior mobile devices, which is why developers previously had to tailor applications to each device's API or firmware. By contrast, the claimed client communications component provides a *device-independent* communication interface on the device itself, fulfilling the need for a "standardized, device-independent interface." ('594 Patent, 2:19-29.)

56. Claim 1 also improves the way the mobile device selects and uses network communication protocols, thereby optimizing link performance in real time. Rather than using a fixed or hard-coded protocol, the claimed method automatically chooses the best protocol based on the device and current network conditions. ('594 Patent, claim 1.) In practice, this means the system assesses attributes of the network connection (for instance, whether it's a cellular or Wi-Fi link and the link's quality) and attributes of the device itself, and selects an appropriate

communication protocol accordingly. ('594 Patent, claim 1.) Claim 1 enumerates specific protocol options, for example, "a socket full-duplex connection protocol, a socket half duplex connection protocol, a HTTP tunneling protocol, and a HTTP polling protocol," and explains that the optimized protocol is automatically chosen from these options "based on a quality of the wireless communications link" ('594 Patent, claim 1.) By tying the protocol selection to concrete parameters the claimed invention goes beyond a generic idea of communication and implements a technical solution tailored to the device's operating environment.

57. Whether the claimed elements of the '594 patent — individually or in combination — were well-understood, routine, and conventional at the time of the invention is a question of fact. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). The factual allegations set forth herein, supported by the specification of the '238 patent, must be accepted as true at the pleading stage and preclude any finding of patent ineligibility under 35 U.S.C. § 101.

**United States Patent No. 9,766,080**

58. On September 19, 2017, the USPTO duly and legally issued United States Patent No. 9,766,080 ("the '080 patent") entitled "Systems and methods for indoor and outdoor mobile device navigation" to inventors C. Enrique Ortiz and Illya Busigin.

59. The '080 patent claims priority to U.S. Provisional Patent Application No. 62/129,665, filed on March 6, 2015, pursuant to 35 U.S.C. § 119. Accordingly, the '080 patent is entitled to a priority date of at least as early as March 6, 2015.

60. The '080 patent is presumed valid under 35 U.S.C. § 282.

61. GoTV Networks owns all rights, title, and interest in the '080 patent.

62. GoTV Networks has not granted Defendant an approval, an authorization, or a license to the rights under the '080 patent.

63. The ’080 patent relates to, among other things, systems and methods for location-based computer processing by a mobile device based on position data from multiple location providers.

64. The claimed invention(s) of the ’080 patent sought to solve problems with, and improve upon, location detection. For example, the ’080 patent explains “[s]everal methodologies have been developed to determine the position of a mobile communications device. For example, the position of a device may be determined based on triangulation of nearby cell towers and based on properties of the connection the device has with each of these towers. However, such methods may yield inaccurate results under certain circumstances such as, for example, when there is insufficient cell tower density to provide precise resolution (*e.g.*, meter-level resolution) of the device's position.” *See* ’080 patent at 1:31-40.

65. The ’080 patent further explains that “Wi-Fi triangulation may also be utilized to determine the position of a mobile communications device. This approach is analogous to cell tower triangulation, but uses Wi-Fi hot spots near the device to determine its position. However, the applicability of this technique may be limited when, for example, the set of known Wi-Fi hot spots in a region is not sufficiently large, or when the user does not have access to the Wi-Fi network because the Wi-Fi radio is off, or when the user has not authenticated with the Wi-Fi network.” *Id*. at 1:40-49.

66. The ’080 patent also explains that “[t]he Global Positioning System (GPS) may also be used to determine the position of a mobile communications device. GPS involves a constellation of satellites that broadcast data, allowing the device to determine its location using a triangulation calculation. However, GPS methodologies may have certain drawbacks. For example, GPS signals may not be sufficiently strong, or may have multipath issues, in certain

locations. Furthermore, receiving and processing GPS position updates on an ongoing basis is typically battery intensive for mobile communications devices." *Id*. at 1:49-58.

67. While "mobile devices may process position data from different types of location providers" at the time of the invention, each of these had significant draw backs. *Id*. at 1:31-60. The '080 patent recognized these drawbacks and "provide[d] methods and systems for performing location-based computer processing based on position data from multiple location providers." *Id.* at 1:64-66. The techniques for performing location-based computer processing claimed by the '080 patent were not routine or conventional at the time of their invention.

68. The '080 patent addresses these deficiencies not by simply using a known positioning technique, but through a specific, multi-layered technical architecture that was unconventional at the time of invention. As a threshold matter, the patent recognized that different location providers — outdoor providers such as GPS, GLONASS, and cell tower triangulation, and indoor providers such as Bluetooth Low Energy, Wi-Fi, and NFC — each use different data models to express position information. *See e.g., id.* at 4:61-5:8. An outdoor GPS provider, for example, may express position as raw latitude and longitude coordinates with a particular accuracy radius, while an indoor BLE provider may express position relative to venue-specific identifiers such as a floor number or proximity to a particular beacon. *See id.* at 6:38–7:45. Prior to the inventions of the '080 patent, applications that needed to use position data from both types of providers had to manage these disparate, vendor-specific data models individually, which increased complexity and impeded seamless transitions between indoor and outdoor contexts. *See id.* at 3:39–64; 6:48–51.

69. To solve this problem, the '080 patent discloses and Claim 13, for example, requires a specific technical process. First, position information is received from both an outdoor

location provider and an indoor location provider that is *distinct* from the outdoor provider. *See e.g., id.* at claim 13. The claimed method then *normalizes* these disparate data streams — that is, it converts the different vendor-specific data models into a provider-independent abstraction. *See e.g., id.* at 3:39–7:45; 9:17-11:46; Figs 2 and 3. The specification explains that this normalization layer generates a common data model that may include latitude, longitude, altitude, bearing, speed, time, floor number, horizontal accuracy, vertical accuracy, uncertainty radius, and location status, among other fields. *See id.* at 6:38–7:4. By abstracting position information from multiple heterogeneous sources into a single normalized representation, the system creates a unified framework that simplifies location-based processing for applications and enables seamless transitions between indoor and outdoor mapping. *See id.* at 3:39–64 (the normalized data model "may simplify location-based processing for applications" since "the position abstraction may be the same regardless of the underlying location provider"); *See also id* at 6:48–51.

70. Using this normalized position information, Claim 13 then requires a *two-factor* determination that the device is transitioning between geographic regions. The first factor is determining, based on the normalized position information, that the mobile device is transitioning from a "first geographic region associated with first map data" to a "second geographic region associated with second map data." *See e.g., id.* at claim 13. The second factor is a separate determination that the mobile device has entered a "zone associated with the second geographic region based on the normalized position information and based on information related to a boundary of a Geo-fence that is associated with the second region." *Id.* The specification explains that this multi-factor approach — combining normalized position analysis with geo-fence boundary detection — provides "more accurate and efficient transitions between

outdoor and indoor mapping" and "multi-factor validation" for transitions between regions. *See id.* at 3:39–47; 11:11–25. Only when both factors are satisfied does the system trigger the display of a map of the second geographic region on the device's user interface. *Id.* at claim 13.

71. Furthermore, Claim 13 requires that both the first and second geographic regions are each associated with their own respective "map data" — the first region with "first map data" and the second region with "second map data." *Id.* at claim 13. This dual map-data architecture means the system maintains distinct mapping contexts for different geographic regions and intelligently switches between them based on the multi-factor transition determination described above. The specification underscores that "such transitions may occur automatically such that the user experience is seamless while moving inside and outside." *See id.* at 11:35–36. In this way, the claimed method does not merely detect a location; it orchestrates a coordinated technical response — normalizing heterogeneous position signals, performing multi-factor transition validation, and automatically switching the displayed mapping context — that provides a concrete improvement in how a mobile device handles the transition between outdoor and indoor environments.

72. The ordered combination of these specific technical steps in Claim 13 — receiving position data from distinct indoor and outdoor providers, normalizing those disparate data streams into a provider-independent format, performing a dual-factor transition determination using both the normalized position and geo-fence boundary information, and conditionally displaying a region-specific map — was not well-understood, routine, or conventional at the time of the invention. No individual location provider, whether GPS, BLE, or Wi-Fi, performed this combination of functions. The specification itself describes how prior approaches yielded "inaccurate results" when relying on any single provider, and how the

normalization and multi-factor validation architecture of the invention provides a more "accurate and precise determination of the device's position" by enabling "position information from disparate location providers" to be "more readily combined or compared." *See id.* at 1:31-64; 3:39-64. Claim 13 thus recites a specific, technically grounded improvement in mobile device navigation — not an abstract idea implemented on generic hardware.

73. Consistent with the foregoing, on information and belief, the features and functionalities of the Target Products and Services and Target System that meet the limitations of the claims of the '080 patent, including at least claim 13, were first introduced after both March 6th, 2015, and the priority date of the '080 Patent. For example, on information and belief, prior to March 6th, 2015, and/or the priority date of the '080 Patent, the Target Mobile Application did not perform automated outdoor-to-indoor transition detection using normalized position information from both indoor and outdoor location providers (such as Bluetooth Low Energy beacons used in conjunction with GPS) and Geo-fence boundary information of the type required by the '080 patent.

74. The absence, prior to March 6, 2015, of an automated, multi-factor indoor/outdoor transition detection feature in the Target Mobile Application — and Target's subsequent introduction of such functionality through Bluetooth Low Energy beacon technology in or about September 2017 (see https://techcrunch.com/2017/09/20/target-rolls-out-bluetooth-beacon-technology-in-stores-to-power-new-indoor-maps-in-its-app/) — demonstrates that the claims of the '080 patent, including at least claim 13, were directed to an unconventional technical solution.



Target rolls out Bluetooth beacon technology in stores to power new indoor maps in its app

Sarah Perez
8:47 AM PDT · September 20, 2017

*See e.g.,* https://techcrunch.com/2017/09/20/target-rolls-out-bluetooth-beacon-technology-in-stores-to-power-new-indoor-maps-in-its-app/; https://techcrunch.com/2015/08/05/target-launches-beacon-test-in-50-stores-with-expanded-rollout-later-this-year/ (showing unconventional "testing");

75. Whether the claimed elements of the '080 patent — individually or in combination — were well-understood, routine, and conventional at the time of the invention is a question of fact. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). The factual allegations set forth herein, supported by the specification of the '080 patent and Target's press releases, must be accepted as true at the pleading stage and preclude any finding of patent ineligibility under 35 U.S.C. § 101.

**United States Patent No. 11,317,238**

76. On April 26, 2022, the USPTO duly and legally issued United States Patent No. 11,317,238 ("the '238 patent") entitled "Monitoring Outdoor and Indoor Regions with Mobile Devices" to inventors Quan Feng, Jason Schmitt, Hua Luo, Narayan Iyer, Paresh Suthar, and Matthew Lindenberger.

77. The '238 patent is a continuation of U.S. Patent Application No. 14/968,240, filed December 14, 2015, which claims priority to U.S. Provisional Patent Application No. 62/091,120, filed December 12, 2014, pursuant to 35 U.S.C. § 119(e). Accordingly, the '238 patent is entitled to a priority date at least as early as December 12, 2014.

78. The '238 patent is presumed valid under 35 U.S.C. § 282.

79. GoTV Networks owns all rights, title, and interest in the ’238 patent.

80. GoTV Networks has not granted Defendant an approval, an authorization, or a license to the rights under the ’238 patent.

81. The ’238 patent relates to, among other things, methods and systems for the allocation of information regarding geographic area received on a mobile device.

82. The claimed invention(s) of the ’238 patent sought to solve problems with, and improve upon, the ability of a mobile device to determine its location and act accordingly.

83. For example, the Claims of the ’238 Patent address specific technical challenges in mobile device location tracking and provide concrete solutions rooted in computer technology. For example, the ’238 patent explains that mobile operating systems impose limits on location monitoring resources – for example, “the OS may limit the number of resources that are utilized to monitor location-based information. For example, the total outdoor regions and indoor regions that an application wants to monitor may outnumber the maximum number of regions that may be monitored by the OS.” *See* ’238 Patent, 1:54-63. The specification further notes that an application “may prefer to monitor different regions based on the position of the user.” *Id*. In other words, conventional mobile devices could not simultaneously track all relevant regions due to OS constraints, creating a technical problem of efficiently managing limited location-monitoring capabilities. *Id*.

84. The ’238 Patent identifies and tackles these technical shortcomings in prior approaches. It describes that relying on any single positioning method (such as GPS alone) can be impractical – “receiving and processing GPS position updates on an ongoing basis is typically battery intensive for mobile communications devices. Accordingly, mobile devices may process position data from different types of location providers” *Id*. at 1:24-50. Instead of using generic,

routine techniques, the patented system unconventionally leverages multiple data sources and dynamic resource allocation to improve performance. The inventors recognized "it may be beneficial for an application operating on a mobile device to allocate the monitoring resources of a mobile device based on the location of a user (as assessed by the position of the user's mobile device)" *Id*. at 1:64-2:4. Therefore, by adaptively concentrating a device's location-tracking resources where they are needed most, the system can overcome OS limitations and reduce unnecessary battery drain, particularly with respect to the related technical problem of detecting transitions across indoor and outdoor regions. *Id*.

85. Consistent with these goals, the '238 Patent's specification lays out detailed solutions that are implemented via specific technological steps. For example, in one embodiment, "an application on a mobile device is pre-loaded with outdoor regions and indoor regions that the application wants to monitor in a large area of interest. Additionally, position information from multiple location providers is received at the mobile device for estimating the position of the mobile device" *Id.* at 4:41-61. Using this pre-loaded region data and incoming position signals (*e.g.* GPS, Wi-Fi, Bluetooth), the system can intelligently decide what to monitor. The patent describes that "[b]ased on the position information, a determination is made as to whether the mobile device is within an outdoor region that is pre-loaded to the application" *Id*. In essence, the software continuously evaluates the device's location relative to the defined geographic "regions" stored on the device. *Id*.

86. The claimed inventions then dynamically allocate the mobile device's location-monitoring resources in one of two modes, depending on that determination. *See e.g.*, *Id.* at claim 1 at elements (c) and (d). If the device is not currently inside any of the predefined outdoor regions, the specification teaches that "the location monitoring resources of the mobile device are

allocated in a first mode which preferentially monitors surrounding outdoor regions" *See e.g.*, *Id.* at 4:41-61, Claim 1. In this first mode, the device focuses its resources on tracking its geographic location with respect to nearby outdoor regions (for example, geofences in the vicinity), and it does not waste power on indoor-location sensors or far-away regions. *Id*. By contrast, "if a determination is made that the mobile device is within a given outdoor region… the location monitoring resources of the mobile device are allocated in a second mode which preferentially monitors the given outdoor region, and also preferentially monitors indoor regions within the given outdoor region." *Id*. In this second mode, the device's indoor location resource (*e.g.,* a Bluetooth or Wi-Fi based positioning module for inside a venue) is activated for the particular region the user entered, while monitoring of other, irrelevant outdoor regions is deprioritized. *See Id*. This targeted switching between modes provides a seamless transition as the user moves between outdoor and indoor environments, ensuring the device always uses the most appropriate location technology for the context without extraneous monitoring.

87. As an example, Claim 1 of the '238 Patent concretely implements this technical solution in the claimed device. It recites a non-transitory computer-readable medium storing code for a process that dynamically "allocat[es] the monitoring resources of the mobile device in a first mode to an outdoor location resource and to exclusion of an indoor location resource when it is determined that the mobile device is outside each of the plurality of outdoor regions" *Id*. at claim 1(c). Conversely, when the mobile device is detected to be inside a given outdoor region, the claimed process "allocat[es] the monitoring resources of the mobile device in a second mode to include the indoor location resource when it is determined that the mobile device is within a given outdoor region among the plurality of outdoor regions and to exclusion of other outdoor regions" *Id*. at claim 1(d). By also reciting that "each of the plurality of outdoor regions includes

at least one… indoor region[]" and that in the first mode the device monitors its location relative to a "subset of the plurality of outdoor regions" (*Id*. at claim 1(a) and (c).), Claim 1 ties these resource-allocation rules to a specific spatial framework defined in the stored region data. In short, the claim requires a tailored sequence of technological steps triggered by the device's location status – receiving region information, determining the device's outside/inside status, and switching between dedicated outdoor-focused and indoor-inclusive monitoring modes accordingly. *See Id*. at claim 1.

88. These claimed features are not generalized computer functions, but rather inventive arrangements that improve the functioning of the mobile device itself. The '238 Patent devotes its disclosure to the technical implementation and advantages of this approach, not to an abstract idea like organizing human activity. The problems solved (including for example, managing a diversity of location sensors and conserving device resources) are technology-specific problems, and the solution (dynamic allocation of location tracking modes using pre-loaded region data and multi-source position inputs) are technology-driven solutions. The patent emphasizes that prior art techniques were inadequate – *e.g.* continuous GPS tracking was impractical due to power constraints, and mobile OS services could not handle monitoring all desired regions simultaneously. *See e.g. Id*. at 1:24-50 ("GPS methodologies may have certain drawbacks. For example, GPS signals may not be sufficiently strong in certain locations. Furthermore, receiving and processing GPS position updates on an ongoing basis is typically battery intensive for mobile communications devices."); Id. at 1:54-63. Exemplary Claim 1's combination of elements operates in a new way to address these technical issues. Notably, the claimed process improves the performance of the mobile device's location services by intelligently adjusting how and where the device expends its limited location-monitoring

resources. *Id*. This yields more efficient operation (*e.g.* avoiding needless scans and reducing battery drain) and an enhanced user experience (seamless indoor-outdoor location awareness), all achieved through the specific technical features recited in, for example, Claim 1.

89. Furthermore, the elements of Claim 1, both individually and as an ordered combination, were not well-understood, routine, or conventional at the time of the invention. The patent itself distinguishes the claimed approach from the prior state of the art. For example, mobile operating systems could monitor outdoor or indoor regions, but only in a limited way, and they did not provide the automatic mode-switching or region-prioritizing mechanism that the inventors devised *See Id.* at 1:24–63. By pre-loading a large set of region definitions into the device and then dynamically reallocating which subset of regions to actively monitor based on the device's real-time location, the invention achieves capabilities beyond the conventional practice. *Id*. The'238 Patent shows that the inventors had to invent a new software-driven scheme to overcome OS limitations and to coordinate multiple location technologies in this manner. *Id*. Accordingly, the specific combination of features recited in exemplary Claim 1 – including the dual-mode resource allocation and the conditional transitions tied to detected region entries/exits – is a specific technical improvement over prior techniques rather than a trivial use of generic computing components. These concrete, innovative features firmly ground the claims of the '238 Patent in a technological realm and support its eligibility under 35 U.S.C. § 101.

90. On information and belief, the features and functionalities of the Target Products and Services and Target System that meet the limitations of the claims of the '238 patent, including at least claim 1, were first introduced after both December 12, 2014, and the priority date of the '238 Patent. For example, on information and belief, the version of Target's Mobile

App that introduced the infringing "Store Mode" feature was first released in or about November 2021.

91. Whether the claimed elements of the '238 patent — individually or in combination — were well-understood, routine, and conventional at the time of the invention is a question of fact. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). The factual allegations set forth herein, supported by the specification of the '238 patent, must be accepted as true at the pleading stage and preclude any finding of patent ineligibility under 35 U.S.C. § 101.

## CLAIMS FOR RELIEF

### Count I – Infringement of United States Patent No. 8,009,619

92. GoTV Networks repeats, realleges, and incorporates by reference, as if fully set forth here, the allegations of the preceding paragraphs above.

93. Target has violated and continues to violate 35 U.S.C. § 271(a) with respect to one or more claims of the '619 patent, including for example Claim 9.

94. Target (or those acting on its behalf) (i) made, used, sold, imported and/or offered to sell the Target Products and Services; and (ii) made, used, sold, sold access to, imported, offered to sell and/or offered to sell access to the Target System, and therefore has infringed, at least, claim 9 of the '619 patent.

95. For example, when a customer opens the Target Website on a mobile device or uses the Target Mobile Application and initiates a chat session with Target customer support, the Target System receives a request for a communications link from a client communications component executing on the handheld device via a communications network. The Target System then establishes a wireless communications link with the handheld device by using a server

communications interface. This occurs when the Target backend responds to a handshake request from the Mobile Application or Website to enable real-time updates.

96. The Target System then automatically selects a socket full-duplex connection protocol such as WebSocket. It does this when the quality of the wireless communications link from the mobile device is above or equal to a threshold. The Target System selects one of a socket half duplex connection protocol, an HTTP tunneling protocol, and an HTTP polling protocol when the quality of the wireless communications link is below the threshold.

97. Claim 9 of the '619 patent provides:

> A server, comprising:
>
> a processor; and
>
> a memory coupled to the processor, the memory storing processor readable code that, when executed by the processor, is configured to cause the processor to:
>
>> receive, via a communications network, a request for a communications link from a client communications component executing on a handheld device;
>>
>> establish a wireless communications link with the handheld device by using a server communications interface;
>>
>> automatically select, as an optimized protocol, a socket full-duplex connection protocol if a quality of the wireless communications link is above or equal to a threshold, or one of a socket half duplex connection protocol, an HTTP tunneling protocol, and an HTTP polling protocol if the quality of the wireless communications link is below the threshold; and
>>
>> automatically implement the optimized protocol between the client communications component and the server communications interface, the optimized protocol being implemented while maintaining a standardized application programming interface (API) for the server communications interface, the communications link being established via the client communications component functioning with a device API component to configure hardware of the handheld device.

98. The Target System comprises a system of backend enterprise servers, databases, and associated computer systems to implement and deploy services that process, handle, and enable communication, integration, and messaging APIs with mobile apps and clients on handheld devices (*e.g.*, the official Target iOS and Android mobile app supporting real-time order tracking, live inventory checks, and customer support features). The collection of these backend computer systems, including processors, memory, and executable code, meets the server limitation claimed in at least Claim 9.

99. The Target System comprises at least one processor that executes software to enable communication, integration, and messaging APIs with mobile apps and clients, including for real-time features such as customer support chat, order status updates and inventory queries. This processor (or collection of processors in the server infrastructure) meets the processor limitation claimed in, at least, claim 9.

100. The Target System comprises a memory coupled to the processor, the memory storing processor readable code. The Target System includes a memory that stores executable software code to enable communication, integration, and messaging APIs with mobile apps and clients, supporting real-time data exchange for features like customer support chat, live order tracking and in-store inventory updates. This memory (or distributed memory in the server infrastructure) meets the memory limitation claimed in, at least, claim 9.

101. The Target System comprises the memory storing processor readable code that, when executed by the processor, is configured to cause the Target System processor to receive a request for a communication link (*e.g.*, a request to initiate a customer support chat session to support a series of communications between the client and the server, as reproduced below) from a client communications component, such as the networking code in the Target Mobile

Application executing on a user's smartphone or tablet or the networking code delivered from Target's website to a browser executing such code. This request is transmitted via a communications network such as the Internet (over cellular data or Wi-Fi). By way of example, the initial request to initiate a customer support chat session meets the request for a communications link limitation, as shown below:






*See e.g.,* screenshots from the Target Mobile Application running on a user's smartphone show that the user clicks the "Chat with us" icon to send a request to Target's backend servers to initiate a customer support chat session between the Target's Mobile Application and Target's backend servers.









*See e.g.,* screenshots from the Target website running in browser show that the user sends a request to Target's backend servers to initiate a customer support chat session between the Target's website and Target's backend servers.

102. The Target System comprises the memory storing processor readable code that, when executed by the processor, is configured to cause the Target System's processor to establish a wireless communications link (*e.g.*, a persistent customer support chat session that enables a series of communications between the client and the server) with the handheld device that initiated the request, by using a server-side communications interface that handles incoming connections from mobile clients. The persistent chat session connection meets the claimed

wireless communications link limitation. The Target's System's server-side endpoint or interface handling the connection meets the server communications interface limitation.

103. The Target System comprises the memory storing processor readable code that, when executed by the processor, is configured to cause the Target System processor to automatically select a socket full-duplex connection protocol (*e.g.*, WebSocket protocol) if the quality of the wireless link supports it (*e.g.*, successful handshake and stable connection), or a half-duplex or HTTP-based protocol (*e.g.*, HTTP polling, tunneling, or similar) if the link quality is insufficient. On information and belief, Target's Live Chat System implements this transport-negotiation and protocol-fallback logic in connection with its real-time customer-facing features (*e.g.*, live order tracking updates, real-time inventory status, or chat support), often implemented via native frameworks or open-source libraries that prioritize efficient protocols with automatic upgrades and fallbacks. The WebSocket protocol (or equivalent full-duplex socket) meets the claimed socket full-duplex connection protocol limitation. The HTTP polling, tunneling, protocols satisfy the claimed socket half duplex connection protocol, HTTP tunneling protocol, or HTTP polling protocol. The connection quality level at which the Target System switches protocols qualifies as the claimed threshold. The Target's System's performance of the protocol selection, as demonstrated in the screenshots below, without requiring user or manual intervention meets the automatic selection limitation.




*See e.g.,* screenshots from the Target Mobile Application running on a user's smartphone.






*See e.g.,* screenshot of a network packet capture from the Target Mobile Application during a live chat session between the user and Target's backend servers, indicating that a WebSocket protocol is automatically selected for communication between the Target's Mobile Application and the Target's backend server. The WebSocket protocol is a full-duplex connection protocol.




Elements Console Sources Network Performance Memory Application
228 2
Preserve log Disable cache No throttling
Filter
Invert More filters
All Fetch/XHR Doc CSS JS Font Img Media Manifest Socket Wasm Other
50,000 ms 100,000 ms 150,000 ms 200,000 ms 250,000 ms 300,000 ms
Name Status Domain Type Initiator Ti...
nicollet_minimize 200 target.my.salesforce-site... svg+xml aura_prod.js:49
nicollet_close 200 target.my.salesforce-site... svg+xml aura_prod.js:49
aura?r=4&aura.Component.getCo... 200 target.my.salesforce-site... xhr client.js:1
nicollet_minimized_chat 200 target.my.salesforce-site... svg+xml aura_prod.js:49
aura?r=5&aura.Component.getCo... 200 target.my.salesforce-site... xhr client.js:1
aura?r=3&aura.ApexAction.execut... 200 target.my.salesforce-site... xhr client.js:1
aura?r=6&aura.ApexAction.execut... 200 target.my.salesforce-site... preflight Preflight
target_icon 200 target.my.salesforce-site... svg+xml aura_prod.js:49
aura?r=6&aura.ApexAction.execut... 200 target.my.salesforce-site... xhr client.js:1
aura?r=7&aura.ApexAction.execut... 200 target.my.salesforce-site... preflight Preflight
aura?r=7&aura.ApexAction.execut... 200 target.my.salesforce-site... xhr client.js:1
aura?r=8&aura.ApexAction.execut... 200 target.my.salesforce-site... preflight Preflight
aura?r=8&aura.ApexAction.execut... 200 target.my.salesforce-site... xhr client.js:1
visitor_messages 101 api.target.com websocket vaPreChat.js:1
aura?r=9&ui-instrumentation-com... 200 target.my.salesforce-site... xhr client.js:1
aura?r=10&aura.Component.getC... 200 target.my.salesforce-site... xhr client.js:1
send_icon 200 target.my.salesforce-site... svg+xml aura_prod.js:49
chasitor_icon 200 target.my.salesforce-site... svg+xml aura_prod.js:49
Availability.jsonp?sid=undefined&... 200 d.la4-c2-ia6.salesforceliv... script aura_prod.js:49
partnerpixels?url=https%3A%2F%... 200 cm.g.doubleclick.net document
Availability.jsonp?sid=undefined&... 200 d.la4-c2-ia6.salesforceliv... script aura_prod.js:49
Availability.jsonp?sid=undefined&... 200 d.la4-c2-ia6.salesforceliv... script aura_prod.js:49
Availability.jsonp?sid=undefined&... 200 d.la4-c2-ia6.salesforceliv... script aura_prod.js:49
collector 200 collector-pxgwpp4wus.p... xhr client.js:1
Availability.jsonp?sid=undefined&... 200 d.la4-c2-ia6.salesforceliv... script aura_prod.js:49
Availability.jsonp?sid=undefined&... 200 d.la4-c2-ia6.salesforceliv... script aura_prod.js:49
46 requests 2.2 MB transferred 11.4 MB resources


Elements Console Sources Network Performance Memory Application
Preserve log Disable cache No throttling
Filter
Invert More filters
All Fetch/XHR Doc CSS JS Font Img Media Manifest Socket Wasm Other
Name
Headers Messages Initiator Timing
General
Request URL wss://api.target.com/digital_help_adapter/v1/visitor_messages
Request Method GET
Status Code 101 Switching Protocols
Response headers Raw
Access-Control-Allow-Credentials true
Access-Control-Allow-Origin https://www.target.com
Access-Control-Expose-Headers X-Api-Id
Connection upgrade
Date Mon, 06 Apr 2026 10:37:22 GMT
Sec-Websocket-Accept 7Ws31FHfpS/9KT5Lhge1c4Wlw18=
Sec-Websocket-Extensions permessage-deflate
Server envoy
Strict-Transport-Security max-age=16000000; includeSubDomains;
Upgrade websocket
Vary Origin
Via HTTP/1.1 Go-Proxy (Go-Proxy/2.17.5)
Via HTTP/1.1 haproxy (api-platform)
X-Api-Id 60755034113301f35a5f07d2b4ec98092a126efb8e58257ee28 7d1f4fd691bda
X-Envoy-Hostname ttcenvoy-tap-prod-f4-010
Request Headers Raw
Accept-Encoding gzip, deflate, br, zstd
nicollet_minimize
nicollet_close
aura?r=4&aura.Component.getCo...
nicollet_minimized_chat
aura?r=5&aura.Component.getCo...
aura?r=3&aura.ApexAction.execut...
aura?r=6&aura.ApexAction.execut...
target_icon
aura?r=6&aura.ApexAction.execut...
aura?r=7&aura.ApexAction.execut...
aura?r=7&aura.ApexAction.execut...
aura?r=8&aura.ApexAction.execut...
aura?r=8&aura.ApexAction.execut...
visitor_messages
aura?r=9&ui-instrumentation-com...
aura?r=10&aura.Component.getC...
send_icon
chasitor_icon
Availability.jsonp?sid=undefined&r...
partnerpixels?url=https%3A%2F%2...
Availability.jsonp?sid=undefined&r...
Availability.jsonp?sid=undefined&r...
Availability.jsonp?sid=undefined&r...
collector
Availability.jsonp?sid=undefined&r...
Availability.jsonp?sid=undefined&r...
46 requests 2.2 MB transferred 11.4

*See e.g.,* screenshots of network packet capture from the Target Website during a live chat session between the user and Target's backend servers, indicating that a WebSocket protocol is automatically selected for communication between the Target's website and the Target's backend server. The WebSocket protocol is a full-duplex connection protocol.

104. The Target System comprises the memory storing processor readable code that, when executed by the processor, is configured to cause the Target System processor to automatically implement and maintain the selected optimized protocol (*e.g.*, WebSocket full-duplex or HTTP polling/tunneling ) between the client communications component (in the Target mobile app) and the Target's System's server communications interface. As demonstrated below, this implementation occurs without requiring changes to higher-level application code, thereby maintaining a consistent interface for sending/receiving data (*e.g.*, for real-time features like chat, inventory updates, or order tracking).




*See e.g.,* screenshots from the Target Mobile Application running on a user's smartphone.







*See e.g.,* a screenshot of a network packet capture from the Target mobile application during a live chat session between the user and Target's backend servers, indicating that a WebSocket protocol is automatically selected for communication between the Target's Mobile Application and the Target's backend server.


target.com/help/contact-us/target-com-order-experience
What can we help you find?
Chat
Talking to: virtual assistant
Hi, I'm Target's Virtual Assistant. How can I help you today?
I need help with a Target order
I need help with something else
hi
Choosing a topic will help me make sure you get the best help for your question. Please choose from the list below.
I need help with a Target order
Send a message...
Chat with us or
Start chat
Phone a live ag
1-800-591-3869


Elements Console Sources Network Performance Memory Application
Preserve log Disable cache No throttling
Filter Invert More filters
All Fetch/XHR Doc CSS JS Font Img Media Manifest Socket Wasm Other
Name Status Domain Type Initiator Ti...
nicollet_minimize 200 target.my.salesforce-site... svg+xml aura_prod.js:49
nicollet_close 200 target.my.salesforce-site... svg+xml aura_prod.js:49
aura?r=4&aura.Component.getCo... 200 target.my.salesforce-site... xhr client.js:1
nicollet_minimized_chat 200 target.my.salesforce-site... svg+xml aura_prod.js:49
aura?r=5&aura.Component.getCo... 200 target.my.salesforce-site... xhr client.js:1
aura?r=3&aura.ApexAction.execut... 200 target.my.salesforce-site... xhr client.js:1
aura?r=6&aura.ApexAction.execut... 200 target.my.salesforce-site... preflight Preflight
target_icon 200 target.my.salesforce-site... svg+xml aura_prod.js:49
aura?r=6&aura.ApexAction.execut... 200 target.my.salesforce-site... xhr client.js:1
aura?r=7&aura.ApexAction.execut... 200 target.my.salesforce-site... preflight Preflight
aura?r=7&aura.ApexAction.execut... 200 target.my.salesforce-site... xhr client.js:1
aura?r=8&aura.ApexAction.execut... 200 target.my.salesforce-site... preflight Preflight
aura?r=8&aura.ApexAction.execut... 200 target.my.salesforce-site... xhr client.js:1
visitor_messages 101 api.target.com websocket vaPreChat.js:1
aura?r=9&ui-instrumentation-com... 200 target.my.salesforce-site... xhr client.js:1
aura?r=10&aura.Component.getC... 200 target.my.salesforce-site... xhr client.js:1
send_icon 200 target.my.salesforce-site... svg+xml aura_prod.js:49
chasitor_icon 200 target.my.salesforce-site... svg+xml aura_prod.js:49
Availability.jsonp?sid=undefined&... 200 d.la4-c2-ia6.salesforceliv... script aura_prod.js:49
partnerpixels?url=https%3A%2F%... 200 cm.g.doubleclick.net document
Availability.jsonp?sid=undefined&... 200 d.la4-c2-ia6.salesforceliv... script aura_prod.js:49
Availability.jsonp?sid=undefined&... 200 d.la4-c2-ia6.salesforceliv... script aura_prod.js:49
Availability.jsonp?sid=undefined&... 200 d.la4-c2-ia6.salesforceliv... script aura_prod.js:49
collector 200 collector-pxgwpp4wus.p... xhr client.js:1
Availability.jsonp?sid=undefined&... 200 d.la4-c2-ia6.salesforceliv... script aura_prod.js:49
Availability.jsonp?sid=undefined&... 200 d.la4-c2-ia6.salesforceliv... script aura_prod.js:49
46 requests 2.2 MB transferred 11.4 MB resources




*See e.g.,* screenshots of network packet capture from the Target Website during a live chat session between the user and Target's backend servers, indicating that a WebSocket protocol is automatically selected for communication between the Target's website and the Target's backend server.

105. The Target's System's high-level messaging/data exchange API (*e.g.*, the abstracted real-time communication API used by Target's backend services and mobile app for features requiring persistent or bidirectional data flow) meets the standardized application programming interface (API) for the server communications interface. The wireless network hardware (*e.g.*, Wi-Fi chipset or cellular modem/radio in the iPhone or Android device) meets the hardware of the handheld device limitation. The device-level networking framework or library (*e.g.*, Java Framework, Native Libraries, Connectivity Manager, HTTPURLConnection on Android, or Foundation Framework (URLSession)/CFNetwork, Network Framework support

on iOS interfacing with the client's communication code) meets the device API component to configure hardware of the handheld device limitation. The automatic implementation of the selected protocol (without manual intervention or code changes at the application layer) while preserving the same higher-level API meets the requirement of implementing the optimized protocol while maintaining a standardized API.

106. Target directly infringed and continues to infringe at least claim 9 of the ’619 patent in violation of 35 U.S.C. § 271(a) by making, using, selling, importing, and/or offering to sell the Target Products and Services; and making, using, selling, selling access to, importing, offering for sale, and/or offering to sell access to the Target System.

107. GoTV Networks has been damaged by the direct infringement of Target and has suffered and continues to suffer irreparable harm and damages as a result of this infringement.

108. GoTV has been damaged by Target’s infringing conduct in an amount no less than a reasonable royalty.

**Count II – Infringement of United States Patent No. 8,060,594**

109. GoTV Networks repeats, realleges, and incorporates by reference, as if fully set forth here, the allegations of the preceding paragraphs above.

110. Target has violated and continues to violate 35 U.S.C. § 271(a) with respect to one or more claims of the ’594 patent, including for example Claim 1.

111. Target (or those acting on its behalf) (i) made, used, sold, imported and/or offered to sell the Target Products and Services; and (ii) made, used, sold, sold access to, imported, offered to sell and/or offered to sell access to the Target System, and therefore has infringed, at least, claim 1 of the ’594 patent.

112. Claim 1 of the ’594 patent provides:

A method, comprising:

> receiving a request for a communications link from an application executing on a handheld device;
>
> accessing a device API component to configure device hardware to implement the communications link;
>
> establishing a wireless communications link with a server;
>
> automatically implementing, at a first time, a first protocol between a client communications component of the handheld device and the server based on a type of the wireless communications link and a type of the handheld device, the communications link being established via the client communications component functioning with the device API component to configure hardware of the handheld device, the client communications component including a hardware abstraction component for translating between the client communications component and device specific hardware functions of the handheld device, the hardware abstraction component is configured to enable the client communications component to implement a stable communications API when installed on multiple different device types; and
>
> automatically implementing, at a second time after the first time, a second protocol, different from the first protocol, between the client communications component and the server based on a quality of the wireless communications link at the second time, the first protocol and the second protocol are each one of a socket full-duplex connection protocol, a socket half duplex connection protocol, an HTTP tunneling protocol, and an HTTP polling protocol.

113. One or more components of the Target System employs and provides a method comprising the step of receiving a request for a communications link (*e.g.,* request from a user to chat with an agent using Target's Chat with us feature) from an application executing (*e.g.,* Target's Chat API/SDK) on a handheld device (*e.g.,* smartphone such as Android or iOS):




*See e.g.,* screenshots from the Target Mobile Application running on a user's smartphone.

114. One or more components of the Target System employs and provides a method comprising the step of accessing a device API component (*e.g.,* the device-level networking framework or library such as Java Framework, Native Libraries, Connectivity Manager, HTTPURLConnection on Android, or Foundation Framework (URLSession)/CFNetwork, Network Framework support on iOS interfacing) to configure device hardware (*e.g.*, Wi-Fi chipset or cellular modem/radio in the iPhone or Android device) to implement the communications link.

115. One or more components of the Target System employs and provides a method comprising the step of establishing a wireless communications link (*e.g.,* a connection is established between the client and the Target's server that supports a series of communications between the client and the Target's server) with a server:

116. One or more components of the Target System employs and provides a method comprising the step of automatically implementing, at a first time, a first protocol (*e.g.,* HTTP

protocol) between a client communications component (*e.g.,* Target's 'Chat with us' API) of the handheld device and the server based on a type of the wireless communications link (*e.g.,* connection type Wi-Fi, 5G etc.,) and a type of the handheld device (*e.g.,* the Sec-Ch-Ua, Sec-Ch-Ua-Platform, or the User Agent fields in the Request Header indicates the type of client device used to send the request, herein, Android), the communications link being established via the client communications component (*e.g.,* Target's Chat with us API/SDK) functioning with the device API component (*e.g.,* the device-level networking framework or library such as Java Framework, Native Libraries, Connectivity Manager, HTTPURLConnection on Android, or Foundation Framework (URLSession)/CFNetwork, Network Framework support on iOS interfacing) to configure hardware of the handheld device, the client communications component including a hardware abstraction component (*e.g.,* Android Hardware Abstraction Layer and equivalent layer in iOS) for translating between the client communications component and device specific hardware functions of the handheld device (*e.g.,* Android Hardware Abstraction Layer provides a standard interface, allowing device APIs framework and native libraries to easily access the hardware of the device), the hardware abstraction component is configured to enable the client communications component to implement a stable communications API when installed on multiple different device types (*e.g.,* Target's Chat API provides a standard interface across different device types):




*See e.g.,* screenshots from the Target Mobile Application running on a user's smartphone.




*See e.g.,* a screenshot of a network packet capture from the Target mobile application during a live chat session between the client and Target's backend servers, indicating that at a first time, a

first protocol (HTTP protocol) is automatically selected for communication between the Target's Mobile Application and the Target's backend server. As shown above, the client sends the HTTP GET and the HTTP POST requests to the server.

The User Agent field in the Request Header indicates the type of client device used to send the request, herein, Android 13.








*See e.g.,* a screenshot of a network packet capture from the Target website during a live chat session between the client and Target's backend servers, indicating that at a first time, a first protocol (HTTP protocol) is automatically selected for communication between the Target's Mobile Application and the Target's backend server. As shown above, the client sends the HTTP GET and the HTTP POST requests to the server.

117. One or more components of the Target's System employs and provides a method comprising the step of automatically implementing, at a second time after the first time, a second protocol (*e.g.,* WebSocket protocol), different from the first protocol (*e.g.,* HTTP protocol), between the client communications component and the server based on a quality of the wireless communications link at the second time, the first protocol and the second protocol are each one of a socket full-duplex connection protocol, a socket half duplex connection protocol, an HTTP tunneling protocol, and an HTTP polling protocol:




*See e.g.,* screenshots from the Target Mobile Application running on a user's smartphone.









*See e.g.,* a screenshot of a network packet capture from the Target mobile application during a live chat session between the user and Target's backend servers, indicating that the connection between the client and server is upgraded to use a Web Socket protocol (a second protocol).


target.com/help/contact-us/target-com-order-experience
What can we help you find?
Chat
Talking to: virtual assistant
Hi Susan, I'm Target's Virtual Assistant! I'm here to guide you and provide support.
How can I help you today?
5:23 PM
Send a message...
Help us improve thi
75 requests 2.3 MB transferred 11.9 MB resources


Elements Console Sources Network Performance Memory Application Security
Preserve log Disable cache No throttling
Filter Invert More filters All Fetch/XHR Doc CSS JS Font Img Media Manifest Socket Wasm Other
Name Status Domain Type Initiator Time
aura?r=8&aura.Component.getComponen... 200 target.my.salesforce-sites.com xhr fs.20250319-01.js:4 34...
v2?OrgId=o-221JN4-na1&UserId=da1c6a... 200 rs.fullstory.com xhr fs.20250319-01.js:4 30...
v2?OrgId=o-221JN4-na1&UserId=da1c6a... 200 rs.fullstory.com xhr fs.20250319-01.js:4 32...
aura?r=9&aura.ApexAction.execute=1 200 target.my.salesforce-sites.com preflight Preflight 33...
target_icon 200 target.my.salesforce-sites.com svg+xml aura_prod.js:49 1 ms
v2?OrgId=o-221JN4-na1&UserId=da1c6a... 200 rs.fullstory.com xhr fs.20250319-01.js:4 33...
aura?r=9&aura.ApexAction.execute=1 200 target.my.salesforce-sites.com xhr fs.20250319-01.js:4 36...
aura?r=10&aura.ApexAction.execute=1 200 target.my.salesforce-sites.com preflight Preflight 34...
aura?r=10&aura.ApexAction.execute=1 200 target.my.salesforce-sites.com xhr fs.20250319-01.js:4 37...
active 200 api.target.com fetch main.min.js:2 1.4...
completions 101 api.target.com websocket vaPreChat.js:1 Pe...
AI_sparkles 200 target.my.salesforce-sites.com svg+xml aura_prod.js:49 33...
v2?OrgId=o-221JN4-na1&UserId=da1c6a... 200 rs.fullstory.com xhr fs.20250319-01.js:4 34...
Availability.jsonp?sid=undefined&r=676&... 200 d.la4-c2-ia6.salesforceliveagen... script aura_prod.js:49 28...
partnerpixels?url=https%3A%2F%2Fwww.t... 200 cm.g.doubleclick.net document 28...
v2?OrgId=o-221JN4-na1&UserId=da1c6a... 200 rs.fullstory.com xhr fs.20250319-01.js:4 30...
v2?OrgId=o-221JN4-na1&UserId=da1c6a... 200 rs.fullstory.com xhr fs.20250319-01.js:4 72...
v2?OrgId=o-221JN4-na1&UserId=da1c6a... 200 rs.fullstory.com xhr fs.20250319-01.js:4 31...
v2?OrgId=o-221JN4-na1&UserId=da1c6a... 200 rs.fullstory.com xhr fs.20250319-01.js:4 30...
v2?OrgId=o-221JN4-na1&UserId=da1c6a... 200 rs.fullstory.com xhr fs.20250319-01.js:4 31...
map.svg 304 www.target.com svg+xml 4bd1b696-520f885cdc995163.js:1 29 ...
v2?OrgId=o-221JN4-na1&UserId=da1c6a... 200 rs.fullstory.com xhr fs.20250319-01.js:4 97...
Availability.jsonp?sid=undefined&r=970&... 200 d.la4-c2-ia6.salesforceliveagen... script aura_prod.js:49 1.1...
v2?OrgId=o-221JN4-na1&UserId=da1c6a... 200 rs.fullstory.com xhr fs.20250319-01.js:4 47...
v2?OrgId=o-221JN4-na1&UserId=da1c6a... 200 rs.fullstory.com xhr fs.20250319-01.js:4 35...
v2?OrgId=o-221JN4-na1&UserId=da1c6a... 200 rs.fullstory.com ping fs.20250319-01.js:4 66...
v2?OrgId=o-221JN4-na1&UserId=da1c6a... 200 rs.fullstory.com xhr fs.20250319-01.js:4 37...
v2?OrgId=o-221JN4-na1&UserId=da1c6a... 200 rs.fullstory.com xhr fs.20250319-01.js:4 1.9...
v2?OrgId=o-221JN4-na1&UserId=da1c6a... 200 rs.fullstory.com xhr fs.20250319-01.js:4 62...
78 requests 2.3 MB transferred 11.9 MB resources




*See e.g.,* screenshots of network packet capture from the Target Website during a live chat session between the user and Target's backend servers, indicating that the connection between the client and server is upgraded to use a Web Socket protocol (a second protocol).

118. Target directly infringed and continues to infringe at least claim 1 of the '594 patent in violation of 35 U.S.C. § 271(a) by making, using, selling, importing, and/or offering to sell the Target Products and Services; and making, using, selling, selling access to, importing, offering for sale, and/or offering to sell access to the Target System.

119. GoTV Networks has been damaged by the direct infringement of Target and has suffered and continues to suffer irreparable harm and damages as a result of this infringement.

120. GoTV has been damaged by Target's infringing conduct in an amount no less than a reasonable royalty.

**Count III – Infringement of United States Patent No. 9,766,080**

121. GoTV Networks repeats, realleges, and incorporates by reference, as if fully set forth here, the allegations of the preceding paragraphs above.

122. Target has violated and continues to violate 35 U.S.C. §§ 271(a) and (b) with respect to one or more claims of the ’080 patent.

123. Target (or those acting on its behalf), including with respect to Target’s internal use for testing and development purposes, (i) made, used, sold, imported and/or offered to sell Target Products and Services; (ii) made, used, sold, sold access to, imported, offered to sell and/or offered to sell access to Target System; and, (iii) induced its customers to use Target Products and Services and Target System, in the United States, and therefore infringed (literally and/or under the doctrine of equivalents) at least claim 13 of ’080 patent.

124. The Target Mobile Applications aims to provide “GPS for your shopping cart”.

## Target launching GPS for your shopping cart




This might be a lifesaver during the holiday season. Target is rolling out new Bluetooth technology on its app that's like GPS for your shopping cart that will show where you are in the store on the app's map. News.

Author: 12news.com
Published: 3:58 AM PDT September 21, 2017
Updated: 3:58 AM PDT September 21, 2017

*See e.g.,* https://www.12news.com/video/features/trending-today/target-launching-gps-for-your-shopping-cart/75-2737271

## Target rolls out Bluetooth beacon technology in stores to power new indoor maps in its app

Sarah Perez
8:47 AM PDT · September 20, 2017

> Target is adding an improved indoor mapping component to its mobile app, designed to help shoppers find their way through stores and locate the products they need, the retailer announced this morning, referring to the feature as a "GPS for your shopping cart." Instead of simply showing a static map, or noting the aisle number where a product can be found, the new Target application will actually show your own location on the map, as indicated by a blinking dot.
>
> As you move through the store, your location will update, too – similar to how the blue dot appears on Google Maps, for example.

*See e.g.,* https://techcrunch.com/2017/09/20/target-rolls-out-bluetooth-beacon-technology-in-stores-to-power-new-indoor-maps-in-its-app/.

125. Over 10 million people have downloaded the Target Mobile Application through Google Play and over 6.7 million people have reviewed the Target Mobile Application in the Apple App Store. *Id*.

126. The Target Mobile Application advertises the use of a "Store Mode" and the ability to provide "smart navigation" and "guiding guests through the aisles to find must have gifts and discover new favorites", as shown:

> **Tech-enhanced — and fun — personal shopping assistant**
>
> Target is also enhancing the in-store shopping experience with smart navigation. Guests shopping in person will have extra help finding everything that sparks joy with the newly enhanced Store Mode in the Target app. As soon as guests enter a Target store, the Store Mode feature automatically activates, guiding guests through the aisles to find must-have gifts and discover new favorites. If an item isn't available, Store Mode connects guests to alternate fulfillment methods (including same-day or next-day delivery in eligible markets), ensuring they get everything they need on every Target run.

*See e.g.,* https://corporate.target.com/press/release/2025/11/target-launches-new-ai-powered-features-to-make-holiday-shopping-easier,-smarter-and-more-fun.

127. Customers of Target use the "Store Mode" to locate items in the store and claim this use increases their ability to efficiently shop at Target.

**Effortless Shopping Experience** Mar 18
★★★★★ Harish Napa Janakiraman

The Target app makes shopping much faster and more enjoyable. I love the Drive Up feature which lets me pick up my orders without even leaving my car. The app also makes it very easy to find items in the store and check prices by scanning barcodes with my phone. The digital coupons and rewards help me save money every time I shop. It is a reliable and well designed app for all my household needs.

*See e.g.,* https://apps.apple.com/us/app/target-shop-style-save/id297430070?see-all=reviews&platform=iphone.

Marian Plummer

★★★★★ April 3, 2026

Target carries so many essentials at good prices. Their sales are fantastic. I find what I need in-store by using the app to locate which aisle. I also often use Drive-up service to save time. The best!

*See e.g.,* https://play.google.com/store/apps/details?id=com.target.ui&referrer=utm_source%3DTarget%26utm_campaign%3Dtgtlp.

128. When a user logs into the Target Mobile Application downloaded on an iPhone, there is a message "Shop in Store Mode" that only appears when inside or in the immediate vicinity of a store. The left screenshot shows the app home screen before arriving in the vicinity of a store. The home screen automatically changes to the view in the right screenshot when inside or in the vicinity of the store.




*See e.g.,* screenshots from the Target Mobile Application.

129. Once at a store and in Store Mode, new options are provided to the user, including a store map, new deals, and product search with in-store location on the map, among others:



4:28
LTE
Close
Alexandria
Open until 11pm
Seasonal
Tech
Fitting Rooms
Snacks
Toys/Games
Activewear
Storage
Grocery
Bath
Womens
School/Office
Pets
Checkout
Wine/Beer
Household
Welcome to Store Mode!
To help you find items and deals even easier, we open Store Mode automatically when you're in store. Opt out any time from your Store Mode settings.
Take a quick tour
Skip tour




4:28
LTE
Alexandria
Explore the store
Use the map to see what's nearby and where to go next.
Next
Seasonal
Tech
Fitting Rooms
Snacks
Toys/Games
Activewear
Storage
Grocery
Bath
Womens
School/Office
Pets
Checkout
Wine/Beer
Household
Search this store
Explore
Deals
List
Easter fun starts here
Map these items
Highly rated
Trending
Discover
Buy Again
Wallet
Cart
My Target




4:28
LTE
Close
Alexandria
Open until 11pm
Seasonal
Tech
Fitting Rooms
Snacks
Toys/Games
Activewear
Storage
Grocery
Bath
Womens
School/Office
Search or scan
Get aisle info, stock, deals, and product information instantly.
Next
Search this store
Explore
Deals
List
Easter fun starts here
Map these items
Highly rated
Trending
Discover
Buy Again
Wallet
Cart
My Target




4:28
LTE
Close
Alexandria
Open until 11pm
Seasonal
Tech
Fitting Rooms
Snacks
Toys/Games
Activewear
Storage
Grocery
Bath
Womens
School/Office
Pets
Checkout
Wine/Beer
Household
Deals, list and more
Access your list, deals, essentials, and more, all in one place.
Done
Explore
Deals
List
Easter fun starts here
Map these items
Highly rated
Trending
Discover
Buy Again
Wallet
Cart
My Target




4:28
LTE
Close
Alexandria
Open until 11pm
water
Close
226 results for "water"
$8.49 ($0.50/fluid ounce)
Poland Spring Maine Spring Water - 32 Pack/16.9 Fl Oz, Plastic Bottles
4.7 (3093)
Aisle G48 In stock
Pickup ready within 2 hours
Sponsored
$5.29 ($0.01/fluid ounce)
Discover
Buy Again
Wallet
Cart
My Target




4:31
LTE
Alexandria
Seasonal
Travel
Tech
Fitting Rooms
Toys/Games
Activewear
Snacks
Baby
Home Decor
Bedding
Grocery
Furniture
Bath
Womens
Boys
Kids
Kitchen
Girls
Cards/Party
Health/Beauty
Pets
Checkout
Wine/Beer
Pharmacy
Entrance
Discover
Buy Again
Wallet
Cart
My Target

*See e.g.,* screenshots from the Target Mobile Application.

130. The Store Mode will notify the user that Bluetooth must be enabled to improve location accuracy:




*See e.g.,* screenshot from the Target Mobile Application.

131. Once in Store Mode and having Bluetooth on, a map becomes viewable, which can be further manipulated to provide more detailed information:




*See e.g.,* screenshots from the Target Mobile Application.

132. Upon searching for a particular product, the Store Mode identifies the location of the product in the store, allowing the user to navigate to the precise location of a product:




*See e.g.,* screenshots from the Target Mobile Application.

133. Once the user drives away from the store, Store Mode is again disabled (the "Shop in Store Mode" message disappears) until the user returns to a store:




*See e.g.,* screenshot from the Target Mobile Application.

134. Being out of Store Mode also means that the Target Mobile Application no longer requires input from the Bluetooth to function, which preserves device battery life on at least an iPhone device.

135. The Target Mobile Application Store Mode increases product sales.

> "We know so many of our guests love shopping our stores with their phones in hand, and when they use the Target app in-store, their basket sizes are nearly 50% higher as they discover more of what they love," said **Cara Sylvester**, chief guest experience officer, Target. "We're committed to making the shopping experience this year even more connected, personal and intuitive, with innovations that help guests discover the hottest items and Target products they love at a great deal. It's all about meeting them where they are, simplifying gift-giving and helping families focus more on the joy of the season."

*See* https://corporate.target.com/press/release/2025/11/target-launches-new-ai-powered-features-to-make-holiday-shopping-easier,-smarter-and-more-fun.

136. On information and belief, the Target Mobile Application Store Mode increases the user's ability to navigate the large store with tens of thousands of products.

- Use our app to manage your in-store shopping list, coupons and store navigation, and use Wallet in the app to pay with Target Circle Card and save with coupons in a single scan.
- Shop on **target.com**.

*See e.g.,* https://corporate.target.com/about/products-services.

**Tech-enhanced — and fun — personal shopping assistant**

Target is also enhancing the in-store shopping experience with smart navigation. Guests shopping in person will have extra help finding everything that sparks joy with the newly enhanced Store Mode in the Target app. As soon as guests enter a Target store, the Store Mode feature automatically activates, guiding guests through the aisles to find must-have gifts and discover new favorites. If an item isn't available, Store Mode connects guests to alternate fulfillment methods (including same-day or next-day delivery in eligible markets), ensuring they get everything they need on every Target run.

Adding some shopping fun: While exploring the aisles, guests can also "Find Bullseye" — an in-store hunt for Target's beloved mascot available through Store Mode in the Target app — and collect a holiday sticker at checkout (while supplies last). And while using the app in-store, virtual animated helpers will guide guests through their app experience, telling jokes and making the shopping trip merrier.

For more ways Target is making the shopping experience this season easier, smarter and more fun than ever, visit the retailer's **holiday resource hub**.

*See e.g.,* https://corporate.target.com/press/release/2025/11/target-launches-new-ai-powered-features-to-make-holiday-shopping-easier%2C-smarter-and-more-fun.

137. The Target Mobile Application directs a user to the exact aisle and bay of a product:




*See e.g.,* screenshots from the Target Mobile Application.




*See*

*e.g.,* https://www.reddit.com/r/UXResearch/comments/1fyx820/instore_target_navigation_on_th

e_iphone_looks_cool/?solution=54ec9afb230d935454ec9afb230d9354&js_challenge=1&token=bbbe4bf1c9a2b5160829c4be34da58613975715ea8cd754942846f4ee04368bf.

138. On information and belief, the Target Mobile Application uses a geofence around its stores to trigger app functionality when a user enters or exits those locations.

139. The Target Mobile Application can also provide an indoor location system using at least Bluetooth and LED light chip technology because GPS may be unreliable inside of buildings.

**Target Privacy Policy**

**Mobile Location Information**

If you use a mobile device, your device may share location information (when you enable location services) with our websites, mobile application(s), services or our service providers. For example, precise geo-location can be used to help you find nearby Target stores; or, in-store location through the use of your phone's blue tooth signal, LED light chip technologies or other technologies will permit Target to find nearby products for you, get you real-time deals, auto-sort your shopping list and more.

*See e.g.*, https://www.target.com/c/target-privacy-policy/-/N-4sr7p.




*See e.g.,* screenshot from the Target Mobile Application.



*See e.g.,* screenshots from the Target Mobile Application

140. Claim 13 of the ’080 patent provides:

> A computer-implemented method for performing location-based computer processing by a mobile device, comprising:
>
>> receiving first position information from an outdoor location provider, wherein the first position information indicates a position of the mobile device;
>>
>> receiving second position information from an indoor location provider, wherein the second position information indicates a position of the mobile device, and wherein the indoor location provider is distinct from the outdoor location provider;
>>
>> obtaining normalized position information based at least in part on the first position information and second position information;
>>
>> determining with a computer processor that the mobile device is transitioning from a first geographic region associated with first map data to a second geographic region associated with second map data based at least on the normalized position information;
>>
>> determining that the mobile device has entered a zone associated with the second geographic region based on the normalized position information and based on information related to a boundary of a Geo-fence that is associated with the second region; and
>>
>> based at least in part on the determination that the mobile device is transitioning from the first geographic region to the second geographic region, displaying a map of the second geographic region on a user interface of the mobile device.

141. The Target Mobile Application employs and provides a computer-implemented method for performing location-based computer processing by a mobile device available for download from app stores like Google Play and Apple App Store. https://play.google.com/store/apps/details?id=com.target.ui&referrer=utm_source%3DTarget%26utm_campaign%3Dtgtlp; https://apps.apple.com/us/app/target-shop-style-save/id297430070.




*See e.g.,* screenshots from the Target Mobile Application.

142. The Target Mobile Application provides for receiving first position information (*e.g.*, GPS position information) from an outdoor location provider, wherein the first position information indicates a position of the mobile device:




*See e.g.,* screenshots from Target Mobile Application indicate that the application requires GPS location permission to locate nearby stores and to enable the in-store map. As shown in the screenshot on the left, the application prompts the user to enable location sharing (when GPS is disabled). The screenshot on the right shows that the user may enable location sharing in response to this prompt.



*See e.g.,* screenshots from Target Mobile Application indicate that, once location sharing is enabled, the application can use the GPS location information to search for nearby stores.

143. The Target Mobile Application provides for receiving second position information (*e.g.*, Bluetooth position information) from an indoor location provider, (*e.g.*, Target's in-store Bluetooth positioning system) wherein the second position information indicates a position of the mobile device, and wherein the indoor location provider is distinct from the outdoor location provider:




*See e.g.,* screenshot from the Target Mobile Application.

> Apps don't just use Bluetooth for tracking your location. And, even if an app is tracking your location, it may be doing that for a useful reason. For example, Target's app uses Bluetooth beacons to determine your location inside its stores. The app can give you directions in the store and guide you to products on the shelves.

*See e.g.*, https://www.howtogeek.com/441691/why-iphone-and-ipad-apps-are-asking-to-use-bluetooth/.

**Target Privacy Policy**

**Mobile Location Information**

If you use a mobile device, your device may share location information (when you enable location services) with our websites, mobile application(s), services or our service providers. For example, precise geo-location can be used to help you find nearby Target stores; or, in-store location through the use of your phone's blue tooth signal, LED light chip technologies or other technologies will permit Target to find nearby products for you, get you real-time deals, auto-sort your shopping list and more.

*See e.g.*, https://www.target.com/c/target-privacy-policy/-/N-4sr7p.

144. The Target Mobile Application provides for obtaining a normalized position information (*e.g.*, precise or accurate location based on GPS and Bluetooth signals) based at least in part on the first position information and second position information;



*See e.g.,* screenshot from the Target Mobile Application.




*See e.g.,* screenshots from Target Mobile Application (Android) indicate that the app uses the precise location of the user.

**Target Privacy Policy**

Depending on applicable laws, some information within the categories above may be considered sensitive personal information, including government identifiers, payment information, race, precise geolocation data, and health data. If required, consent will be obtained before collecting sensitive personal information (e.g., before the mobile application uses precise geolocation to enable features like drive-up services and in-store maps).

*See e.g.,* https://www.target.com/c/target-privacy-policy/-/N-4sr7p.

**Location**
Approximate location and Precise location

**Data collected and for what purpose**

**Approximate location** · Optional
App functionality, Analytics, Advertising or marketing, Fraud prevention, security, and compliance, Personalization

**Precise location** · Optional
App functionality, Analytics, Advertising or marketing, Fraud prevention, security, and compliance, Personalization

*See e.g.*, https://play.google.com/store/apps/datasafety?id=com.target.ui.

**When Location Accuracy is on**

When Location Accuracy is on, your device uses these sources to get the most accurate location, which may include elevation or floor level:

- Wireless signals, if available, such as:
  - GPS
  - Wi-Fi
  - Mobile cellular networks
- Sensors, if available, such as:
  - Accelerometer
  - Barometer
  - Gyroscope

This can be especially important if you're using your device indoors or when GPS satellites are obscured, because in those situations devices need to use additional signals to be able to estimate their location. Apps and services with the appropriate permissions can use this location to provide you with location-based features.

*See e.g.*, https://support.google.com/android/answer/3467281?hl=en#zippy=%2Cwhen-location-accuracy-is-on. When location accuracy is turned on, wireless signals such as GPS, Wi-Fi, and Bluetooth are used to obtain the most accurate location.







*See e.g.*, https://www.reddit.com/r/UXResearch/comments/1fyx820/instore_target_navigation_on_the_iphone_looks_cool/?solution=54ec9afb230d935454ec9afb230d9354&js_challenge=1&token=bbbe4bf1c9a2b5160829c4be34da58613975715ea8cd754942846f4ee04368bf.

145. The Target Mobile Application provides for determining with a computer processor that the mobile device is transitioning (*e.g.*, outdoor-to-indoor transition) from a first geographic region (*e.g.*, outdoor area) associated with first map data to a second geographic region (*e.g.*, indoor area) associated with second map data (*e.g.*, indoor map associated with the store) based at least on the normalized position information:

> **Why is a store automatically coming up as 'my store' in the Target app?**
>
> If you've enabled location permissions for the Target app, we're able to detect that you are inside a Target store, or very nearby. We'll show you item locations, pricing, and weekly ads all specific to the store you're currently in.

*See e.g.*, https://help.target.com/help/TargetGuestHelpArticleDetail?articleId=ka95d000000wpb8AAA&articleTitle=Why+is+a+store+automatically+coming+up+as+%27my+store%27+in+the+Target+app%3F. The Target Mobile Application automatically detects when a user enters a store or is in

the vicinity of a store and displays the message "Shop in Store Mode". This indicates a transition from an outdoor area to an indoor area.




*See e.g.,* screenshots from Target Mobile Application indicate that Store Mode is automatically activated when a user is inside the store or in its vicinity.



*See e.g.*, https://www.linkedin.com/posts/miketempleton_retail-mobile-stores-activity-7330219434428510209-4rPB/.

> When opening the Target app at any of their locations, shoppers can expect a clear call-to-action (CTA) on the homescreen to "Shop in Store Mode." When tapped, a map with the store's floorplan is displayed.




*See e.g.*, https://radar.com/blog/why-leading-retailers-are-investing-in-store-mode.

146. On information and belief, the Target Mobile Application provides for determining that the mobile device has entered a zone (*e.g.*, in-store) associated with the second geographic region (*e.g.*, indoor area) based on the normalized position information and based on information related to a boundary of a Geo-fence (*e.g.*, store geofence) that is associated with the second region:

**Why is a store automatically coming up as 'my store' in the Target app?**

If you've enabled location permissions for the Target app, we're able to detect that you are inside a Target store, or very nearby. We'll show you item locations, pricing, and weekly ads all specific to the store you're currently in.

*See e.g.*,

https://help.target.com/help/TargetGuestHelpArticleDetail?articleId=ka95d000000wpb8AAA&articleTitle=Why+is+a+store+automatically+coming+up+as+%27my+store%27+in+the+Target+app%3F. The Target Mobile Application automatically detects when a user enters a store or is in the vicinity of a store (geofenced area around the store) and displays the message "Shop in Store Mode". This occurs when location sharing is enabled and the user is within a store geofence.




*See e.g.,* Screenshots from the Target Mobile Application. The message "Shop in Store Mode" that only appears when inside or in the immediate vicinity of a store. The left screenshot shows the app home screen before arriving in the vicinity of a store. The home screen automatically changes to the view in the right screenshot when in the vicinity of the store.

When opening the Target app at any of their locations, shoppers can expect a clear call-to-action (CTA) on the homescreen to "Shop in Store Mode." When tapped, a map with the store's floorplan is displayed.




*See e.g.*, https://radar.com/blog/why-leading-retailers-are-investing-in-store-mode.

The store mode is enabled when the user is in the vicinity of the store, and the Target Mobile Application displays a map of the store.




*See e.g.,* screenshots from the Target Mobile Application.

147. The Target Mobile Application provides for displaying a map of the second geographic region (*e.g.*, an indoor map corresponding to the layout of the store) on a user interface (*e.g.*, display) of the mobile device, based at least in part on the determination that the mobile device is transitioning from the first geographic region to the second geographic region (*e.g.*, The indoor map of the store, along with the user's location on it, is displayed when the app detects that the user is in the immediate vicinity of the store):


4:33
Welcome
Explore new circle deals today!
New at
Deals
Weekly Ad
Clothing, Shoes & Access
Outdoor Living & Garden
Get ready for sunny days.
Shop outdoor essentials
What can we help you find?
Shop in Store Mode Map items, find deals & more
Discover
Buy Again
Wallet
Cart
My Target


4:28
Close
Alexandria
Open until 11pm
Seasonal
Tech
Fitting Room
Snacks
Toys/Games
Activewear
Storage
Grocery
Bath
Womens
School/Office
Pets
Checkout
Wine/Beer
Household
Welcome to Store Mode!
To help you find items and deals even easier, we open Store Mode automatically when you're in store. Opt out any time from your Store Mode settings.
Take a quick tour
Skip tour


4:28
Alexandria
Explore the store
Use the map to see what's nearby and where to go next.
Next
Seasonal
Tech
Fitting Rooms
Snacks
Toys/Games
Activewear
Storage
Grocery
Bath
Womens
School/Office
Pets
Checkout
Wine/Beer
Household
Search this store
Explore
Deals
List
Easter fun starts here
Map these items
Highly rated
Trending
Discover
Buy Again
Wallet
Cart
My Target


4:28
Close
Alexandria
Open until 11pm
Seasonal
Tech
Fitting Room
Snacks
Toys/Games
Activewear
Storage
Grocery
Bath
Womens
School/Office
Pets
Checkout
Wine/Beer
Household
Deals, list and more
Access your list, deals, essentials, and more, all in one place.
Done
Explore
Deals
List
Easter fun starts here
Map these items
Highly rated
Trending
Discover
Buy Again
Wallet
Cart
My Target


4:28
Close
Alexandria
Open until 11pm
water
Close
226 results for "water"
$8.49 ($0.50/fluid ounce)
Poland Spring Maine Spring Water - 32 Pack/16.9 Fl Oz, Plastic Bottles
4.7 (3093)
Aisle G48 In stock
Pickup ready within 2 hours
Sponsored
$5.29 ($0.01/fluid ounce)
Discover
Buy Again
Wallet
Cart
My Target


4:31
Alexandria
Seasonal
Travel
Tech
Fitting Room
Snacks
Toys/Games
Activewear
Baby
Home Decor
Bedding
Grocery
Furniture
Bath
Womens
Boys
Kids
le G48
Kitchen
Girls
Cards/Party
akery
Health/Beauty
Pets
Checkout
Wine/Beer
Pharmacy
Entrance
Discover
Buy Again
Wallet
Cart
My Target

*See e.g.,* screenshots from the Target Mobile Application displaying the in-store map on the display of the mobile phone.

When opening the Target app at any of their locations, shoppers can expect a clear call-to-action (CTA) on the homescreen to "Shop in Store Mode." When tapped, a map with the store's floorplan is displayed.




*See e.g.,* https://radar.com/blog/why-leading-retailers-are-investing-in-store-mode.



*See e.g.*, https://www.reddit.com/r/UXResearch/comments/1fyx820/instore_target_navigation_on_the_iphone_looks_cool/?solution=54ec9afb230d935454ec9afb230d9354&js_challenge=1&token=bbbe4bf1c9a2b5160829c4be34da58613975715ea8cd754942846f4ee04368bf.

148. Target directly infringed and continues to infringe at least claim 13 of the ’080 patent in violation of 35 U.S.C. § 271(a) by making, using, selling, importing, and/or offering to sell Target Products and Services; and making, using, selling, selling access to, importing, offering for sale, and/or offering to sell access to Target System.

149. At least as early as the service of the instant Complaint, Target will be in violation of 35 U.S.C. § 271(b) and will indirectly infringe at least claim 13 of the ’080 patent by knowingly and specifically intending to induce infringement by others (including, without limitation, inducing Target’s customers to use the Target Products and Services and Target System) and possessing specific intent to encourage infringement by Target’s customers. Target Products and Services and Target System are and were specifically configured to function in accordance with the ’080 patent claims.

150. To the extent any step of claim 13 of the ’080 patent is performed by Target’s customers or end users rather than by Target directly, Target is nevertheless liable for direct infringement under 35 U.S.C. § 271(a) because Target directs or controls those customers’ performance of those steps. Specifically, Target conditions its customers’ access to and use of the Target Mobile Application’s Store Mode and indoor-navigation features on the customers’ performance of the claimed steps — including by requiring customers to download and install the Target Mobile Application, agree to Target’s terms of service and location-sharing

permissions, and enable Bluetooth and location services in order to receive the benefits of the accused functionality.

151. GoTV Networks has been damaged by the direct and indirect infringement of Target and has suffered and continues to suffer irreparable harm and damages as a result of this infringement.

152. GoTV has been damaged by Target's infringing conduct in an amount no less than a reasonable royalty.

**Count IV – Infringement of United States Patent No. 11,317,238**

153. GoTV Networks repeats, realleges, and incorporates by reference, as if fully set forth here, the allegations of the preceding paragraphs above.

154. Target has violated and continues to violate 35 U.S.C. §§ 271(a) and (b) with respect to one or more claims of the '238 patent.

155. Target (or those acting on its behalf) (i) made, used, sold, imported and/or offered to sell Target Products and Services; (ii) made, used, sold, sold access to, imported, offered to sell and/or offered to sell access to Target System; and, (iii) induced its customers to use Target Products and Services and Target System, in the United States, and therefore infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the '238 patent.

156. Claim 1 of the '238 patent provides:

> A non-transitory computer readable medium storing code segments causing a computer processor to execute a process for allocating monitoring resources of a mobile device based on information received at the mobile device, the process comprising:
>
> > (a) receiving, over a network, a plurality of outdoor regions and a plurality of indoor regions associated with a geographic area at the mobile device, wherein each of the plurality of outdoor regions includes at least one of the plurality of indoor regions;

> (b) determining, using a computer processor, whether the mobile device is outside of each of the plurality of outdoor regions;
>
> (c) allocating the monitoring resources of the mobile device in a first mode to an outdoor location resource and to exclusion of an indoor location resource when it is determined that the mobile device is outside each of the plurality of outdoor regions, wherein the first mode of allocating the monitoring resources of the mobile device comprises monitoring a geographic location of the mobile device with respect to at least a subset of the plurality of outdoor regions; and
>
> (d) allocating the monitoring resources of the mobile device in a second mode to include the indoor location resource when it is determined that the mobile device is within a given outdoor region among the plurality of outdoor regions and to exclusion of other outdoor regions of the plurality of regions, wherein the second mode of allocating the monitoring resources of the mobile device comprises monitoring a geographic location of the mobile device in the given outdoor region with respect to the at least one indoor region.

157. The Target Mobile Application comprises a non-transitory computer readable medium storing code segments causing a computer processor (*e.g.*, a processor in a mobile device on which the Target Mobile Application has been installed) to execute a process for allocating monitoring resources (*e.g.*, either GPS or Bluetooth based monitoring) of a mobile device based on information received at the mobile device (*e.g.*, information related to the current location of the mobile device) through the Target Mobile Application.




*See e.g.,* screenshots from Target Mobile Application (Android) indicate that the application uses the GPS location information to search for nearby stores.




*See e.g.,* screenshots from Target Mobile Application (iOS) indicate that the application uses the GPS location information to search for nearby stores.

**Why iPhone and iPad Apps Are Asking to Use Bluetooth**

Apps don't just use Bluetooth for tracking your location. And, even if an app is tracking your location, it may be doing that for a useful reason. For example, Target's app uses Bluetooth beacons to determine your location inside its stores. The app can give you directions in the store and guide you to products on the shelves.

*See e.g.*, https://www.howtogeek.com/441691/why-iphone-and-ipad-apps-are-asking-to-use-bluetooth/.

**Target Privacy Policy**

**Mobile Location Information**

If you use a mobile device, your device may share location information (when you enable location services) with our websites, mobile application(s), services or our service providers. For example, precise geo-location can be used to help you find nearby Target stores; or, in-store location through the use of your phone's blue tooth signal, LED light chip technologies or other technologies will permit Target to find nearby products for you, get you real-time deals, auto-sort your shopping list and more.

*See e.g.*, https://www.target.com/c/target-privacy-policy/-/N-4sr7p.

Bluetooth signals are used for indoor positioning, and GPS signals are used to calculate the outdoor position. Thus, monitoring resources are allocated based on the current position information of the mobile device on which the Target application is installed. If the mobile device is in an outdoor area (outside the Target retail locations), GPS-based monitoring is selected (to search for nearby Target stores), and if the mobile device is in an indoor area, Bluetooth based monitoring is selected.

158. The Target Mobile Application provides for receiving, over a network, a plurality of outdoor regions (*e.g.*, a plurality of outdoor regions related to Target's retail locations, including for example the regions surrounding a Target retail location, its parking lots, etc.) and a

plurality of indoor regions (*e.g.*, a plurality of indoor regions related to Target's retail locations, including for example the regions associated with indoor departments, checkouts, etc.) associated with a geographic area, at the mobile device, wherein each of the plurality of outdoor regions includes at least one of the plurality of indoor regions:




*See e.g.,* screenshots from Target Mobile Application indicate that the app receives information related to Target stores ("a plurality of outdoor regions") located near the current geographic area ("a geographic area") of the mobile device on which the Target app is installed.




*See e.g.,* screenshots from Target Mobile Application indicate that the app has access to the indoor map ("indoor region") of each Target retail store. These indoor maps include information about several departments, such as Toys/Games, Grocery, Home Decor, Restrooms, and Checkout.

159. The Target Mobile application has access to the indoor map (store layout) of each store, and can detect which store the customer is located in.

**Why is a store automatically coming up as 'my store' in the Target app?**

If you've enabled location permissions for the Target app, we're able to detect that you are inside a Target store, or very nearby. We'll show you item locations, pricing, and weekly ads all specific to the store you're currently in.

*See e.g.,* https://help.target.com/help/TargetGuestHelpArticleDetail?articleId=ka95d000000wpb8AAA&articleTitle=Why+is+a+store+automatically+coming+up+as+%27my+store%27+in+the+Target+app%3F


16:03
45%
Store Mode
Open automatically in store
If you use the app in a Target store, we'll open Store Mode. (Requires location permissions.)
Discover
Buy Again
Wallet
Cart
My Target


14:50
21%
North Dallas
Open until 23:00 GMT-05:00
Mens
Baby
Toys/Games
Travel
Home Decor
Girls
Welcome to Store Mode!
To help you find items and deals even easier, we open Store Mode automatically when you're in store. Opt out any time from your Store Mode settings.
Take a quick tour
Skip tour


4:33
LTE
Welcome
Explore new circle deals today!
New at
Deals
Weekly Ad
Clothing, Shoes & Access
Outdoor Living & Garden
Get ready for sunny days.
Shop outdoor essentials
What can we help you find?
Shop in Store Mode
Map items, find deals & more
Discover
Buy Again
Wallet
Cart
My Target


4:28
LTE
Close
Alexandria
Open until 11pm
Seasonal
Tech
Fitting Rooms
Snacks
Toys/Games
Activewear
Storage
Grocery
Bath
Womens
School/Office
Pets
Checkout
Wine/Beer
Household
Starbucks
Search this store
Explore
Deals
List
Easter fun starts here
Map these items
Highly rated
Trending
Discover
Buy Again
Wallet
Cart
My Target

*See e.g.,* screenshots from Target Mobile Application indicate that Store Mode is automatically activated when a user is inside the store or in its vicinity.




*See e.g.,* https://www.linkedin.com/posts/miketempleton_retail-mobile-stores-activity-7330219434428510209-4rPB/.

When opening the Target app at any of their locations, shoppers can expect a clear call-to-action (CTA) on the homescreen to "Shop in Store Mode." When tapped, a map with the store's floorplan is displayed.



*See e.g.,* https://radar.com/blog/why-leading-retailers-are-investing-in-store-mode.

If the user opens the Target Mobile Application at any Target retail store location, a message, "Shop in Store Mode," is displayed on the home screen. When the user taps "Shop in Store Mode," a map with the store's floor plan is displayed.

160. Each outdoor region (GPS and/or geofenced outdoor location of the store) is associated with a corresponding indoor region (indoor layout of the store).




*See e.g.,* screenshots from Target Mobile Application indicate that the app has access to the indoor map ("indoor region") of each Target retail store. Each Target retail store such as Brooklyn Fulton St, Jersey City and North Dallas is an "outdoor region", and the Mobile Application has access to the indoor map ("indoor region") of each store.

**Tech-enhanced — and fun — personal shopping assistant**

Target is also enhancing the in-store shopping experience with smart navigation. Guests shopping in person will have extra help finding everything that sparks joy with the newly enhanced Store Mode in the Target app. As soon as guests enter a Target store, the Store Mode feature automatically activates, guiding guests through the aisles to find must-have gifts and discover new favorites. If an item isn't available, Store Mode connects guests to alternate fulfillment methods (including same-day or next-day delivery in eligible markets), ensuring they get everything they need on every Target run.

*See e.g.,* https://corporate.target.com/press/release/2025/11/target-launches-new-ai-powered-features-to-make-holiday-shopping-easier%2C-smarter-and-more-fun. The Store Mode is activated when the user enters the Target store, and the app displays the message "Shop in Store Mode."




*See e.g.,* screenshots from Target Mobile Application.

161. The Target Mobile Application provides for determining, using a computer processor, whether the mobile device is outside of each of the plurality of outdoor regions. This is evidenced, for example, by the fact that the Target Mobile Application does not provide the

"Shop in Store Mode" indication on the home screen when the mobile device is outside the geographic boundary of the plurality of outdoor regions corresponding to its retail stores.

**Why is a store automatically coming up as 'my store' in the Target app?**

If you've enabled location permissions for the Target app, we're able to detect that you are inside a Target store, or very nearby. We'll show you item locations, pricing, and weekly ads all specific to the store you're currently in.

*See e.g.*,

https://help.target.com/help/TargetGuestHelpArticleDetail?articleId=ka95d000000wpb8AAA&articleTitle=Why+is+a+store+automatically+coming+up+as+%27my+store%27+in+the+Target+app%3F




*See e.g.,* Screenshot of the Target Mobile Application illustrating the home screen when the mobile device is located outside the geographic boundary of the plurality of outdoor regions.




*See e.g.,* Screenshot of the Target Mobile Application illustrating the home screen displaying the message "Shop in Store Mode" when the mobile device is located inside or in close proximity to the geographic boundary of a Target retail store (outdoor regions).

162. The Target Mobile Application provides for allocating the monitoring resources of the mobile device in a first mode (*e.g.*, a mode corresponding to the operation of the Target Mobile Application when its "Store Mode" feature is unavailable) to an outdoor location resource (*e.g.*, a GPS monitoring resource) and to exclusion of an indoor location resource (*e.g.*, Bluetooth monitoring resource) when it is determined that the mobile device is outside each of the plurality of outdoor regions, (*e.g.*, when the mobile device is outside of the region surrounding a Target retail location), wherein the first mode of allocating the monitoring resources of the mobile device comprises monitoring a geographic location of the mobile device with respect to at least a subset of the plurality of outdoor regions.




*See e.g.,* screenshots from Target Mobile Application (iOS) indicate that the application uses the GPS location information to search for nearby stores. When the mobile device on which the application is installed is outside of, or not in proximity to, a Target retail store location, GPS-based monitoring is utilized to identify Target stores located near the mobile device's current geographic location.

163. The Target Mobile Application provides for allocating the monitoring resources of the mobile device in a second mode (*e.g.*, a mode corresponding to the operation of the Target Mobile Application when its "Store Mode" feature is operational) to include the indoor location resource (*e.g.*, Bluetooth monitoring resource) when it is determined that the mobile device is within a given outdoor region (*e.g.*, when the mobile device is inside of the region surrounding a Target retail location) among the plurality of outdoor regions (*e.g.*, a plurality of regions surrounding multiple Target retail locations) and to exclusion of other outdoor regions of the plurality of regions, wherein the second mode of allocating the monitoring resources of the mobile device comprises monitoring a geographic location of the mobile device in the given

outdoor region with respect to the at least one indoor region, (*e.g.*, a department within a Target retail location).




*See e.g.,* screenshots from Target Mobile Application. The app automatically detects when a user is in vicinity of Target retail store. This occurs when location sharing is enabled and the user is inside or in the vicinity of the Target retail store location.




*See e.g.,* Screenshot of the Target Mobile Application illustrating the home screen displaying the message "Shop in Store Mode" when the mobile device is located inside or in the vicinity of the geographic boundary of a Target retail store (outdoor regions). Bluetooth based monitoring is used when Store Mode is activated.

**Why is a store automatically coming up as 'my store' in the Target app?**

If you've enabled location permissions for the Target app, we're able to detect that you are inside a Target store, or very nearby. We'll show you item locations, pricing, and weekly ads all specific to the store you're currently in.

*See e.g.,*

https://help.target.com/help/TargetGuestHelpArticleDetail?articleId=ka95d000000wpb8AAA&articleTitle=Why+is+a+store+automatically+coming+up+as+%27my+store%27+in+the+Target+app%3F

**Target Privacy Policy**

> **Mobile Location Information**
>
> If you use a mobile device, your device may share location information (when you enable location services) with our websites, mobile application(s), services or our service providers. For example, precise geo-location can be used to help you find nearby Target stores; or, in-store location through the use of your phone's blue tooth signal, LED light chip technologies or other technologies will permit Target to find nearby products for you, get you real-time deals, auto-sort your shopping list and more.

*See e.g.,* https://www.target.com/c/target-privacy-policy/-/N-4sr7p.

Bluetooth signals are used for indoor positioning, and GPS signals are used to calculate the outdoor position. Thus, monitoring resources are allocated based on the current position information of the mobile device on which the Target application is installed. If the mobile device is in an outdoor area (outside the Target retail store location), GPS-based monitoring is selected (to search for nearby Target stores), and if the mobile device is in an indoor area (inside or in vicinity of Target retail store location), Bluetooth based monitoring is selected.

164. Each outdoor region (GPS and/or geofenced outdoor location of the store) is associated with a corresponding indoor region (indoor layout of the store).




*See e.g.,* screenshots from Target Mobile Application indicate that the app has access to the indoor map ("indoor region") of each Target retail store. Each Target retail store such as Brooklyn Fulton St, Jersey City and North Dallas is an "outdoor region", and the Mobile Application has access to the indoor map ("indoor region") of each store.

165. Target directly infringed and continues to infringe at least claim 1 of the '238 patent in violation of 35 U.S.C. § 271(a) by making, using, selling, importing, and/or offering to sell Target Products and Services; and making, using, selling, selling access to, importing, offering for sale, and/or offering to sell access to Target System.

166. At least since its receipt of the instant Complaint, Target will know that its continued offering and support of the Target Products and Services will induce its customers to directly infringe the '238 Patent and that Target's encouraging acts will result in direct infringement by its customers.

167. Target instructed and continues to instruct customers to use Target Products and Services and Target System, without limitation, through Target's website and the Target Mobile Application, which provide access to, and support for using Target Products and Services and Target System.

168. Target's customers directly infringed at least claim 1 of the '238 patent through their use of the Target Mobile Application.

169. At least since the service of the instant Complaint, Target will be in violation of 35 U.S.C. § 271(b) and will indirectly infringe at least claim 1 of the '238 patent by knowingly and specifically having intended to induce infringement by others (including, without limitation, Target's customers) and possessing specific intent to encourage infringement by Target's customers. Target Products and Services and Target System are and were specifically configured to function in accordance with the '238 patent claims.

170. To the extent any step or operation of claim 1 of the '238 patent is performed or executed by Target's customers or end users (including by virtue of executing code segments stored on a non-transitory computer readable medium that has been distributed to or installed on customer devices) rather than by Target directly, Target is nevertheless liable for direct infringement under 35 U.S.C. § 271(a) because Target directs or controls those customers' performance and execution of those steps. Specifically, Target conditions its customers' access to and use of the Target Mobile Application's outdoor- and indoor-region monitoring features on the customers' performance of the claimed steps — including by requiring customers to download and install the Target Mobile Application, agree to Target's terms of service and location-sharing permissions, and enable Bluetooth and location services in order to receive the benefits of the accused functionality.

171. GoTV Networks has been damaged by the direct and/or indirect infringement of Target and suffered and continues to suffer irreparable harm and damages as a result of this infringement.

172. GoTV has been damaged by Target's infringing conduct in an amount no less than a reasonable royalty.

**JURY DEMANDED**

173. Pursuant to Federal Rule of Civil Procedure 38(b), GoTV Networks hereby requests a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE GoTV Networks respectfully requests this Court to enter judgment in its favor and against Defendant as follows:

a. finding that Target has infringed one or more claims of the '619 patent under 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents;

b. finding that Target has infringed one or more claims of the '594 patent under 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents;

c. finding that Target has infringed one or more claims of the '080 patent under 35 U.S.C. §§ 271(a) and (b), either literally or under the doctrine of equivalents;

d. finding that Target has infringed one or more claims of the '238 patent under 35 U.S.C. §§ 271(a) and (b), either literally or under the doctrine of equivalents;

e. awarding GoTV Networks damages under 35 U.S.C. § 284, or otherwise permitted by law, including supplemental damages for any continued post-verdict infringement;

f. permanently enjoining Target and its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in concert therewith

from infringement of the Patents-in-Suit; or, in the alternative, an award of a reasonable ongoing royalty for future infringement of the Patents-in-Suit by such entities;

g. awarding costs of this action (including all disbursements) and attorney fees pursuant to 35 U.S.C. § 285, or as otherwise permitted by the law;

h. awarding GoTV Networks pre-judgment and post-judgment interest on the damages award and costs; and

i. awarding such other costs and further relief that the Court determines to be just and equitable.

Dated: July 24, 2026

Respectfully submitted,

By: /s/ Raymond W. Mort, III
Raymond W. Mort, III
Texas State Bar No. 00791308
raymort@daignaultiyer.com
**DAIGNAULT IYER LLP**
111 Congress Ave, Suite 500
Austin, TX 78701
Tel/Fax: (512) 865-7950

**ATTORNEYS FOR PLAINTIFF**